Christopher E. WETMORE, James P. Skinner and Jeffery L. Loranger, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Ogis FIELDS, Jack Culley, Lauren Ketchum, Ted Cleavinger, Royce Pugh, and Walter Dickey, Defendants.

No. 78–C–163.

United States District Court, W. D. Wisconsin.

Oct. 13, 1978.

Mark J. Wleklinski, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiffs.

Frederick J. Erhardt, Asst. U. S. Atty., Frank M. Tuerkheimer, U. S. Atty., Madison, Wis., for defendants Fields, Culley, Ketchum, Cleavinger and Pugh.

James H. Petersen, Asst. Atty. Gen., State of Wis., Bronson LaFollette, Atty. Gen., Madison, Wis., for defendant Dickey.

JAMES E. DOYLE, District Judge.

This is an action for monetary, injunctive, and declaratory relief. Plaintiffs, inmates at the Federal Correctional Institution at Oxford, Wisconsin (FCI–Oxford), contend that defendants have interfered in various ways with the constitutional rights of access to the courts belonging to plaintiffs and other inmates. Jurisdiction is present under 28 U.S.C. § 1331.

In their amended complaint, plaintiffs assert five claims for relief.

In Count I, plaintiffs seek injunctive relief precluding the federal defendants from removing the plaintiffs from the positions they held in the institution law library prior to March 14, 1978, a declaratory judgment that the removal of plaintiffs from those positions was illegal, and monetary damages for the removal.

In Count II, plaintiffs seek injunctive relief precluding the federal defendants from continuing to deter association among plaintiffs and other inmates for the purpose of providing and receiving legal research and writing assistance; a judgment declaring that plaintiffs have been denied illegally their right to provide legal assistance to other inmates and declaring also that the inmates at FCI–Oxford have been denied illegally their right to receive legal assistance from the plaintiffs; and monetary damages.

In Count III, plaintiffs seek injunctive and declaratory relief requiring the federal defendants to provide an adequate law library at FCI–Oxford or adequate assistance from persons trained in the law to aid inmates in the preparation and filing of legal papers.

In Count IV, plaintiffs request injunctive and declaratory relief requiring the federal defendants to follow their nondiscretionary duties of providing and maintaining an adequate law library or inmate legal assistance program and of permitting association among plaintiffs and other inmates.

In Count V, plaintiffs seek a declaration that the University of Wisconsin Legal Assistance to Inmates Project denies the inmates at FCI–Oxford meaningful access to the courts and denies them the equal protection of the law by refusing to assist inmates with suits against the institution. Also, they seek injunctive relief compelling defendants to operate the University of Wisconsin Legal Assistance to Inmates Program in a manner which provides legal assistance for inmates in their suits against the institution and its personnel.

Presently before the court are three motions by plaintiffs: a motion for class certification, a motion for permission to file a second amended complaint, and an amended motion for a preliminary injunction. All motions have been briefed by the parties. All parties are represented by counsel.

## I. MOTION FOR CLASS CERTIFICATION AND MOTION TO AMEND

Plaintiffs seek to certify their entire lawsuit as a class action on behalf of all persons confined presently at FCI–Oxford. The Honorable Barbara B. Crabb, United States Magistrate, has prepared a report and recommendation on the motion for class certification in which she suggests that the motion should be granted as to Counts III and IV and denied as to Counts I, II, and V. Defendants have raised no objections to the Magistrate's recommendation.

Plaintiffs, however, object to the recommendation with respect to Count V. The Magistrate noted that the pleadings do not allege that any of the named plaintiffs has sought and been denied legal assistance from the University of Wisconsin Legal Assistance to Inmates Program (LAIP). Ac-

cordingly, she concluded that the named plaintiffs cannot properly represent those inmates who have sought and have been denied, such help. Plaintiff contends that their proposed second amended complaint contains the allegations that the Magistrate found lacking; that these allegations are incorporated by reference from the initial verified complaint filed by named plaintiffs; and that the allegations are supported by exhibits.

■ Rule 15(a) of the Federal Rules of Civil Procedure permits the filing of an amended complaint after the filing of responsive pleadings only where leave of court is granted. Stating that "leave shall be freely given when justice so requires," Rule 15(a) encourages the court to look favorably upon requests to amend. Wright and Miller, 6 *Federal Practice and Procedure,* § 1480 at 405 (1971 ed.). The major consideration in a motion to amend is whether the amendment will prejudice defendants' rights. The proposed second amended complaint simply adds allegations that plaintiffs Wetmore and Skinner sought and were denied, assistance from LAIP, and incorporates three exhibits (O, P, and Q) from the original verified complaint. These changes do not alter the substance of plaintiffs' claims. They only affect plaintiffs' capacity as representatives of a class action on Count V. The motion to amend should be granted.

■ Having considered the entire record, including the Magistrate's report and recommendation, I conclude that this action should be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to the claims asserted in Counts III, IV, and V of the second amended complaint.

## II. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction which would:

(1) preclude the federal defendants, Fields, Culley, Ketchum, Cleavinger, and Pugh, and their successors, employees or agents, from operating the prison law library at FCI–Oxford less than forty hours per week;

(2) preclude the federal defendants, their successors, employees, or agents, from deterring or continuing to deter associations among the named plaintiffs and other inmates for the purpose of legal research and writing assistance at FCI–Oxford;

(3) preclude the federal defendants, their successors, employees, or agents, from removing or continuing to exclude the named plaintiffs from the position each of them held on and before March 14, 1978, in the prison law library at FCI–Oxford; and

(4) command all defendants, their successors, employees, or agents to operate and continue to operate LAIP at FCI–Oxford so that legal aid is provided to inmates concerning suits or other remedies against the prison and its personnel.

On June 16, 1978, a nonevidentiary hearing was held on this motion. At the close of the hearing I denied plaintiffs' motion for an order that LAIP must provide assistance regarding legal actions and other remedies against FCI–Oxford and its personnel. I took the remainder of the motion under advisement. The balance of this opinion addresses the three undecided portions of plaintiffs' motion.

■ To prevail on a motion for a preliminary injunction, plaintiffs must establish (1) a reasonable probability of success on the merits; (2) the prospect of irreparable harm if the injunction is not issued; (3) and the absence of adverse effects on others so serious as to render the issuance of the injunction inequitable. *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1069 (7th Cir. 1976) *modified on other grounds,* 548 F.2d 715 (7th Cir. 1977); *Banks v. Trainor,* 525 F.2d 837, 841 (7th Cir. 1975). In the present case, plaintiffs will suffer irreparable harm if the injunction is not issued and no one, including defendants, will be subjected to serious adverse effects if the injunction is issued. The decisive question is whether plaintiffs enjoy a reasonable likelihood of success on the merits of their claims.

## A. FACTS

On the basis of the entire record, including the first amended complaint, the answer, affidavits and exhibits, I make the following findings of fact for the purpose of deciding the motion for preliminary injunction.

1. Plaintiff Christopher E. Wetmore is a prisoner of the State of Vermont. He is confined, pursuant to the custody of the United States Bureau of Prisons, in the Federal Correctional Institution at Oxford, Wisconsin (FCI–Oxford).

2. Plaintiff James P. Skinner is a federal prisoner confined at FCI–Oxford.

3. Plaintiff Jeffery L. Loranger is a federal prisoner confined at FCI–Oxford.

4. Defendant Ogis Fields is the Warden of FCI–Oxford, and an employee of the Federal Prison Service. He is legally responsible for the operation of FCI–Oxford and for the welfare of each prisoner there.

5. Defendant Jack Culley is the Associate Warden of Operations at FCI–Oxford, and an employee of the Federal Prison Service. He is immediately subordinate to defendant Fields and he is responsible for actions concerning the staff, inmates or operations of the prison.

6. Defendant Loren Ketchum is the Associate Warden of Programs at FCI–Oxford, and an employee of the Federal Prison Service. He is immediately subordinate to defendant Fields and he is responsible for actions concerning the staff, inmates or programs of the prison.

7. Defendant Ted Cleavinger is the Supervisor of the Education Department at FCI–Oxford, and an employee of the Federal Prison Service. He is subordinate to defendant Fields and immediately subordinate to defendants Culley and Ketchum. Defendant Cleavinger is responsible for supervision of the Education Department in general and the law library in particular at FCI–Oxford.

8. Defendant Royce Pugh is the Assistant Supervisor of Education at FCI–Oxford and an employee of the Federal Prison Service. He is subordinate to defendants Fields, Culley, and Ketchum and immediately subordinate to defendant Cleavinger. Defendant Pugh is responsible for supervision of the Education Department in general and the law library in particular.

8a. Defendant Walter Dickey is Program Director of the University of Wisconsin Legal Assistance to Inmates Program and an employee of the State of Wisconsin. He is responsible for supervision of that program at FCI–Oxford.

9. The law library at FCI–Oxford is housed within the general prison library which is part of the Education Department. Bureau of Prisons Policy Statement 2001.-2B, dated May 8, 1972, and entitled "Access to Legal Reference Materials and Legal Counsel and Preparation of Legal Documents," provides in part 4(h) that legal reference materials should "be made available for inmate use as needed. Where possible, evening and weekend hours should be provided." This Bureau of Prisons Policy Statement is implemented at FCI–Oxford by Oxford Policy Statement OX2001.1B, dated March 9, 1978. In accordance with part 5(c) of the Oxford Policy Statement, the law library is open for inmate use from 5:00 p. m. to 9:00 p. m. Monday through Friday and from 8:00 a. m. to 4:00 p. m. Saturday. The law library is closed Sundays and holidays. During the week the law library hours coincide with college classes and also overlap with the dinner hour.

10. The Bureau of Prisons Policy Statement, supra, provides in part 6(a):

Inmates should be allowed to have a reasonable amount of time to prepare their documents. What is reasonable depends upon the individual circumstances. Inmates who are required to meet deadlines in connection with pending litigation in general should be given more latitude than those who are preparing to institute suit and are not required to file within a given period. Documents presented for submission to the court should always be forwarded. If they are threatening or indecent, a special cover letter should ac-

company the document explaining Bureau policy and relevant background factors and data.

The Oxford Policy Statement, *supra,* states in part (5)(e):

Special cases that require access will be handled on an individual basis. A memorandum will be sent to the Education Supervisor by the Unit Manager approving the need for use of the Law Library at other than the usual hours. The memorandum will indicate the period of time needed by the inmate to complete the legal work.

The Education Supervisor will then arrange for the individual's use of the Law Library. The Supervisor of Education will maintain a file of these cases showing all inmates for whom special use of the Law Library was arranged. The memorandum for the inmate will also show the actual time spent on legal research and preparation of the legal case. This file will be kept in the Supervisor of Education's Office.

It further provides in part 7(a):

Inmates who are required to meet verified imminent deadlines in connection with pending litigation, should be given more latitude than those who are preparing to institute suit and are not required to file within a given period. A verified imminent deadline may occur when the inmate has less than three weeks remaining before a scheduled court action. Documents presented for submission to the courts will always be forwarded.

11. One inmate, Albert Johnson, who is enrolled in college courses has been able to use the law library only on Saturdays because he does not face an imminent deadline or has had to miss his classes to work on his legal problems during the week. Because of the law library hours, two other inmates, Randy Smith and James St. John, decided to drop their college classes in order to pursue legal remedies.

12. Legal Assistance to Inmates Program (LAIP) is a course offered by the University of Wisconsin Law School. Under the supervision of lawyers, law students provide legal services to inmates and mental patients in all state institutions and to inmates at FCI–Oxford. The program is paid for by the University of Wisconsin through contracts with the Wisconsin Division of Corrections, the Wisconsin Division of Community Services, and the Federal Bureau of Prisons. Defendant Dickey has decided not to represent inmates and patients in lawsuits raising civil rights claims against the Division of Corrections, the Division of Community Services, or the Bureau of Prisons, or their employees. As a result, LAIP offers no legal assistance to inmates at FCI–Oxford concerning claims about the conditions of their confinement.

13. On March 14, 1978, plaintiff Wetmore held the position of Inmate Law Librarian and plaintiff Skinner held the position of Inmate Resource Librarian at the FCI–Oxford Law Library. Their duties included supervising the use of the law library materials and assisting other inmates with legal matters. In connection with the task of supervising the use of law library materials, Wetmore and Skinner: submitted requests to the prison administration to update and replace existing legal resource materials and to obtain new law books and periodicals; initiated a law book loan procedure and a recording system for legal materials subject to loss and pilferage; and requested that the prison administration expand the number of hours which the law library was open to the general inmate population. In connection with the task of assisting other inmates with legal matters, Wetmore and Skinner provided legal research and writing assistance to other prisoners in a variety of *pro se* legal matters including civil rights actions, petitions for writs of habeas corpus, and parole hearings and appeals. They also helped inmates with inter-institutional and intra-institutional problems such as filing administrative remedy forms and requests for, or objections to, transfers.

14. On March 14, 1978, plaintiff Loranger held the position of Resource Library Aide at the FCI–Oxford prison law library. In this capacity, Loranger assisted Wetmore

and Skinner with their law library supervision and legal assistance by performing clerical work.

15. To a number of inmates at FCI–Oxford, including the sixteen men who filed affidavits in relation to the pending motion, Wetmore and Skinner are the only sources of reasonably well-informed legal assistance, since LAIP is precluded from rendering assistance in lawsuits against the institution or its personnel and since the overburdened condition of the student intern program sometimes prevents prisoners from receiving timely legal aid in other matters. Between December 1977 and March 1978, Wetmore and Skinner furnished legal assistance to at least ninety (90) inmates.

16. Wetmore, Skinner, and Loranger worked diligently in their law library positions. They received good work reports and appear to be respected by those inmates who have sought their assistance. To plaintiffs' knowledge, no complaints had been lodged against them with respect to their law library work.

17. On March 14, 1978, Cleavinger requested permission from Ketchum to terminate the three Education Department positions held by Wetmore, Skinner, and Loranger. At about this time, three nonprisoner employees (two persons from UW-Baraboo for the resource library and one from a CETA program) had been added, or were about to be added, to the Education Department at the prison. Ketchum agreed to the termination of plaintiffs' positions.

18. On the same day, Wetmore, Skinner, and Loranger were summoned simultaneously to the main office of the Education Department and informed by Cleavinger that their jobs had been terminated.

19. Prior to the time of the terminations, Winston Burt and Lois Drapin, employees of the University of Wisconsin-Baraboo who worked, respectively, as the Coordinator and Assistant Coordinator of the Associate Degree Program in the Education Department at FCI–Oxford, had no knowledge about the transfers of plaintiffs from their law library jobs. At no time had Burt or Drapin heard or known of complaints about the conduct or competence of plaintiffs with respect to their work in the law library.

20. On March 14, 1978, after Wetmore, Skinner, and Loranger were terminated from their law library positions, Winston Burt was asked by someone in the Education Department to assume custodial responsibility for the materials in the new library. Burt agreed to this request because the law library stock is situated in the same room as the regular prison library. Burt also was asked to assume additional responsibilities such as checking out law books and providing legal research assistance. Burt declined this request because the University of Wisconsin librarian at FCI–Oxford is an educational resource librarian, not a legal librarian.

21. When, on March 14, 1978, Wetmore, Skinner, and Loranger were notified of their job terminations, they were advised that their law library positions had been eliminated for "administrative reasons." Shortly thereafter Wetmore delivered to Cleavinger an "Inmate Request to Staff" form (also known as "copouts" and administrative form No. 70) asking for an explanation of the terminations. In a response dated March 15, 1978, Cleavinger wrote, "The institution has the authority to abolish, assign, or change work assignment of any individual inmates."

22. After the termination, Wetmore and Skinner were assigned to work in Chief Mechanical Services. Wetmore was placed in the masonry shop. Skinner was sent first to the masonry shop but then was transferred to the plumbing department. Neither Wetmore nor Skinner had experience in the work to which they were assigned. Upon meeting their new supervisor in Chief Mechanical Services, they were told that their services were neither needed nor wanted in that department. Their assignments subsequent to the transfer were less desirable than their assignments in the law library.

23. After the job terminations, Loranger remained in an unassigned work status

for three or four weeks and then, at his request, was given a work detail as a clerk in the FCI–Oxford hospital. His assignment subsequent to the transfer was less desirable than his assignment in the law library.

24. At the time of their job terminations, Wetmore, Skinner, and Loranger requested reassignments to the Education Department when positions became available. Cleavinger stated to plaintiffs that no jobs would be opening in the library. After these three plaintiffs had been transferred from their law library jobs, an inmate position as janitor was opened. Another inmate was selected to fill the position.

25. Oxford Policy Statement OX–7300.-34C, entitled "Inmate Manpower Utilization," specifies the procedures to be followed in assigning prisoners to work details. The relevant sections provide:

6. *PROCEDURES*

b. *Permanent Work Assignment.* Upon classification by the Functional Unit Team, the inmate's temporary job assignment will be reviewed and a permanent work assignment will be made. In most cases the temporary assignment will be recorded as the permanent work assignment as determined by the Unit Team. If a change is indicated with reference to the temporary work assignment, other than emergencies, will be accomplished by the Unit Team.

Whenever a change in work assignment is made by the Unit Team, that information will be transmitted to the Associate Warden-Operations Secretary for entry on the daily transfer sheet.

\*   \*   \*   \*   \*   \*

d. *Temporary Work Assignments.* Occasionally, based upon institutional need or other circumstances, an inmate or an entire detail may need to be placed on temporary work assignments. When this becomes necessary, the detail supervisor will consult with the department head to determine the length of time the detail

will be inoperative. The department head will then consult with the Unit Manager(s) for placing of the inmate(s) on a temporary assignment. When this occurs, the inmate will be advised by the detail supervisor the reason(s) for this temporary assignment. Where possible and practical, the assignment should be compatible with the inmate's program. The inmate will perform satisfactorily the work assigned to him.

e. *Emergency Changes.* Occasionally, emergency job changes become necessary. When this occurs, the concerned department head will contact the appropriate Unit Manager and the action will be entered on the daily transfer sheet or on the emergency Night Orders if after normal duty hours.

\*   \*   \*   \*   \*   \*

g. *Mechanical Services.* All inmates assigned to mechanical services will be initially assigned to the Chief, Mechanical Services. The Chief, Mechanical Services will then determine the specific detail to which as [sic] inmate is to be assigned. This assignment will be communicated to the Associate Warden-Operations Secretary via a daily transfer work sheet. Mechanical Service foremen shall communicate their assignment needs to the Chief, Mechanical Services who will contact the various unit teams to have these requirements fulfilled.

26. When Wetmore's law library position was terminated, he faced an approaching court deadline. Pursuant to Oxford Policy Statement 2001.1B, part 7(a), Wetmore requested additional time in the law library.

27. On March 14, 1978, Cleavinger consulted with Ketchum regarding extra use of the law library by both Wetmore and Skinner. On March 16, 1978, after Ketchum consulted with Charles Faulkner, Regional Legal Counsel, he determined that Wetmore and Skinner would have sufficient

time to meet their court deadlines. Ketchum believed that their removal from the law library would provide Wetmore and Skinner with additional time to work on their cases. On March 17, 1978, Cleavinger and Ketchum decided that if on March 22, Wetmore and Skinner indicated that they still needed additional time in the law library, then Cleavinger would make the law library available to them from 12:30 p. m. to 3:30 p. m. from Monday, March 23 through Friday, March 31.

28. On March 17, 1978, Wetmore's request was denied. He was told only that his request would be reconsidered on March 23. Wetmore then sent an "Inmate Request to Staff" form to Cleavinger protesting the denial. In his response, dated March 20, 1978, Cleavinger gave no further explanation of the decision to deny his request for extra law library time.

29. On March 28, 1978, two weeks after the terminations of the law library positions held by Wetmore, Skinner, and Loranger, Cleavinger submitted the following memorandum to G. A. Laccativa, Executive Assistant at FCI–Oxford:

> We want to make the following changes in the inmate education crew:
>
> Transfer Legal Librarian, Grade 1, to [Education] Clerk, Grade 1.
>
> Transfer Library Aid, Grade 2, to Library Orderly, Grade 2. The position description is attached.
>
> Transfer Library Aid, Grade 3, to [Education] Clerk, Grade 3.
>
> Cancel Teacher Aid, Grade 4, and Clerk, Grade 4. This changes the number assigned from sixteen to fourteen positions.

Underneath this typed portion of the memorandum is a handwritten undated note which reads: "Jerry[_ _] This is necessary due to the changes we made in the law library." Between the words "this" and "is" are the letters "wa" with a line deleting them. The initials following the note are not legible. Beneath this handwritten note is another handwritten note which states: "Approved 4/3/78 Ogis Fields."

30. The memorandum was sent to Laccativa through Ketchum's office. Forwarding the memo to Laccativa, Ketchum indicated that the changes recommended by Cleavinger were necessary due to changes made in the law library.

31. On May 15, 1978, Wetmore submitted an "Inmate Request to Staff" form to the Dane Unit Team. In the request, Wetmore asked for additional law library time to draft traverses for the habeas corpus petitions of two other inmates, Raymond Leo Cowles and Robert Joseph Whitcomb. Wetmore explained that both Cowles and Whitcomb are unlettered in the law, are indigent and, thus, unable to retain counsel, and are ineligible for LAIP aid because their petitions sue institution personnel. Wetmore further represented that Cowles faced a court deadline of May 17 or 18, 1978, and that Whitcomb faced a court deadline of May 29, 1978. These deadlines meet the timetable of Policy Statement 2001.1B, part 7(a).

32. The disposition of Wetmore's inmate request, signed by Unit Manager John Brush, states:

> The institution does not provide inmates as legal assistants. This does not prevent your assistance during regular law library hours.
>
> I can only suggest they contact the law interns for assistance.
>
> Requests for additional time in the law library should be made by an individual working on his own case.

33. Earlier, on January 5, 1978, inmate David Muse had asked defendant Cleavinger for permission to use the law library extra hours to prepare a traverse with and for another prisoner, Carl Merchant. Muse pleaded constitutional rights under *Johnson v. Avery* and an approaching court deadline. Denying the request, Cleavinger stated, "I can't be opening it [the law library] up for everybody."

34. On or about the afternoon of March 31, 1978, plaintiff Skinner, pursuant to a grant of extra time in the law library, was preparing documents for a court filing deadline in his own case, *Skinner v. Fields,*

78–C–7. Unit Manager Edwards entered the law library and threatened Skinner and Wetmore with disciplinary action if he found them working on legal matters other than their own personal cases. Edwards also threatened that Skinner and Wetmore would be banned from the law library during off hours if they were found working on, or assisting with, other inmates' cases. During the same afternoon, while delivering legal mail to Skinner and Wetmore, staff member Clifford Kroshus checked whether Skinner and Wetmore were working on their own, or other prisoners' cases.

35. On or about June 10, 1978, staff member Young informed Wetmore that he had searched Wetmore's cell and had confiscated items believed to be contraband. Thereafter Wetmore checked his cell, which he had left double locked, and discovered that his brief in support of the present motion, which he had left on his desk, was missing. When Wetmore confronted Young about the missing brief, Young joked about the matter. Wetmore asked Young to call a superior staff member to rectify the problem. Young refused. Wetmore then requested permission to call his attorney. His request was denied by both Lt. Lamar and Counselor Westfield.

36. Just prior to March 21, 1978, while preparing the present action, plaintiffs asked that their complaint, motions and exhibits be photocopied and offered to pay the institution for the reproduction services. Acceding to the request only with respect to the exhibits, Clifford Kroshus, a Unit Team Counselor, told plaintiffs that they could type more copies of the complaint and the motions on the typewriters in the law library.

37. Plaintiffs also asked Dan Edwards, Case Manager on plaintiff's Unit Team, to provide notary services for documents in the present action. Edwards first refused but, after some delay, complied with the request.

38. On August 31, 1977, a letter from the Wisconsin Civil Liberties Union to plaintiff Skinner was opened by the prison staff. Skinner asked Unit Manager Brush to verify that the letter had been opened. Brush complied with the request and then stated, "If you take me to court over this, and cost me my job, I will kill you." Skinner filed an "Inmate Request to Staff" form about this incident. In response, Culley investigated Skinner's complaint and, after speaking to both parties and witnesses, concluded that Brush made no bona fide threat and that although Brush made "a poor choice of words," his remark was "offered in a joking manner."

39. During the investigation of the incident between Skinner and Brush, Culley spoke with inmate Harry Merryfield who overheard Brush's comment. During the interview, Culley told Merryfield that inmate requests such as that submitted by Skinner merely created paper work, that no action would be taken concerning Skinner's complaint, that Culley, who was a long-time friend of Brush, could not believe Brush would make such a statement in the presence of witnesses.

40. A few minutes have been subject to warnings or threats for pursuing legal remedies and associating with named plaintiffs. An unidentified staff member told inmate Randall Redhead that "doors would close, instead of open" for him if he continued to associate with jailhouse lawyers. When preparing a regional parole appeal, inmate Kim Erickson was asked by a Reverand S. Johnson, "You are into that legal shit, are you aware of what you're doing?" And Unit Manager J. Webber told inmate Randy Smith that Smith could get himself into "serious trouble" by associating with Wetmore and Skinner. Both Wetmore and Skinner had helped Smith with an administrative remedy form and a petition for habeas corpus.

41. The conduct of the plaintiffs in assisting other inmates with their litigation was a substantial and motivating factor in the defendants' decision to transfer them from the law library to other, less desirable assignments. They were transferred by the defendants either for the purpose of punishing them for their conduct in assisting other inmates with their litigation or for the pur-

pose of impeding them in providing such assistance, or for both such purposes.

## B. OPINION

### 1. *Standing*

In their answer to the first amended complaint, defendants allege that plaintiffs lack standing to bring the present action. Neither plaintiffs nor defendants addressed the issue during the oral argument, or in the briefs submitted, on the amended motion for a preliminary injunction. Since the question of standing affects the constitutional authority of this court to exercise jurisdiction over the amended complaint as well as judicially-created limitations on the exercise of that authority, I must resolve the standing controversy before I can reach the merits of the motion for preliminary injunction.

■ Plaintiffs clearly enjoy standing to contend that the prison law library must be in operation not less than 40 hours a week and that they be returned to their jobs in the law library. As prisoners desiring to study possible deprivation of their legal rights, they are among those injured by the allegedly inadequate time during which the library resources are available to prisoners generally. As the particular prisoners who have been removed from their jobs in the law library, they are the direct sufferers from that allegedly wrongful act. It is only with respect to the assertion of the rights of other prisoners to associate with plaintiffs for the purpose of being assisted in legal research and writing that plaintiffs' standing might be open to question. However, this question has been answered by *Buise v. Hudkins*, 584 F.2d 223 (7th Cir. 1978). Standing is present as to the plaintiffs' claims for all three items of relief still viable on their motion for a preliminary injunction.

### 2. *Law on Access to the Courts*

■ It is now well established that prisoners enjoy a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).[1] In the last decade, the Supreme Court has announced certain safeguards to insure that inmate access to the courts is "adequate, effective, and meaningful." *Id.* at 822, 97 S.Ct. 1491. In *Johnson v. Avery*, 393 U.S. 483, 490, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the Court held that absent some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, a state may not validly enforce a prison regulation barring inmates from furnishing legal assistance to other prisoners. The decision rested upon the recognition that the rule banning legal assistance from inmates essentially barred persons who are "totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited" from filing applications for judicial relief. *Id.*, 393 U.S. at 487, 89 S.Ct. at 750.[2] *Johnson v. Avery* was extended in *Wolff v. McDonnell, supra*, 418 U.S., at 577–80, 94 S.Ct. 2963, to include inmate legal assistance in civil rights actions.[3] And in *Bounds v. Smith, supra*, the

---

1. Although the origin of the constitutional right of access to the courts has sparked some debate (see Burger and Rehnquist, dissenting, in *Bounds, supra*, 430 U.S. at 833–34, 837–40, 97 S.Ct. 1491), the Court stated in *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that the right is founded in the due process clause.

2. It should be noted that although some access-to-the-courts cases involve indigent inmates, see e. g. *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) and *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), the holding of *Johnson v. Avery* is not conditioned upon an inmate's financial status. This reading of *Johnson* appears in both *Wolff v. McDonnell, supra*, 418 U.S. at 578–

580, 94 S.Ct. 2963, and *Bounds v. Smith, supra*, 430 U.S. at 823–34, 97 S.Ct. 1491.

*Johnson* rights, however, are clearly directed to inexperienced or illiterate inmates who are unable to prepare their own legal claims. As such, *Johnson* does not address the right of inmates, capable of preparing and litigating their own legal claims, to receive assistance from other prisoners.

3. The right of access to the courts in general and the right of inmate legal assistance in particular have been recognized in this circuit and in this court. See *Knell v. Bensinger*, 522 F.2d 720 (7th Cir. 1975); *Cross v. Powers*, 328 F.Supp. 899 (W.D.Wis.1971); *Nickl v. Schmidt*, 351 F.Supp. 385 (W.D.Wis.1972).

Court ruled that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498 (footnote omitted).

So radically and massively does government assault individual freedom when it engages in imprisonment that, in my view, the due process clause should be held to require that through the weeks, months, and years, prisoners be afforded abundant and effective means to mount challenges to particular conditions of confinement for resolution by the judicial branch. Without regard to the degree of formal education, intellectual powers, or gifts of expression of a particular prisoner, he or she should be constitutionally entitled to a choice among: adequate assistance from persons trained in the law, direct access to truly adequate law libraries, and the opportunity for assistance from fellow prisoners with legal research and writing.

I believe that the inferior courts should not be avid to discern in the disjunctive "or" as it appears in *Johnson, McDonnell,* and *Bounds* too extreme a frugality in the Supreme Court's vindication of prisoners' "adequate, effective, and meaningful" (*Bounds,* 430 U.S., at 822, 97 S.Ct. 1491) access to the courts. Although that Court has discussed the subject at some length, I do not understand it as yet to have purported to enter a definitive decree addressed to the many dimensions of the problem.

Nevertheless, the Supreme Court has clearly refrained from pronouncing the simple and direct rule which I have just expressed. At the stage of deciding upon interlocutory injunctive relief, I consider myself constrained to adopt a rather tight view of the interplay between *Johnson* and *McDonnell,* on the one hand, and *Bounds,* on the other. In *Bounds,* the Court suggests that, at least in some circumstances, the *Johnson-McDonnell* right to inmate legal assistance survives the *Bounds* right to either an adequate law library or adequate assistance from persons trained in the law. In *Bounds,* the Court explains (430 U.S. at 823–24, 97 S.Ct. at 1496) (footnotes omitted):

> In *Johnson* and *Wolff, supra,* the issue was whether the access rights of ignorant and illiterate inmates were violated without adequate justification. Since these inmates were unable to present their own claims in writing to the courts, we held that their "constitutional right to help," *Johnson v. Avery, supra,* [393 U.S.] at 502 [89 S.Ct. 747] (White, J., dissenting), required at least allowing assistance from their literate fellows. But in so holding, we did not attempt to set forth the full breadth of the right of access. In *McDonnell,* for example, there was already an adequate law library in the prison. The case was thus decided against a backdrop of availability of legal information to those inmates capable of using it. And in *Johnson,* although the petitioner originally requested lawbooks, see 393 U.S., at 484, 89 S.Ct. 747, the Court did not reach the question, as it invalidated the regulation because of its effect on illiterate inmates. Neither case considered the question we face today and neither is inconsistent with requiring additional measures to assure meaningful access to inmates able to present their own cases.

Thus, whereas *Johnson* and *McDonnell* seek to insure minimum standards for meaningful access to the courts for illiterate or poorly educated inmates, *Bounds* seeks to insure minimum standards for meaningful access to the courts for prisoners capable of preparing their own legal papers. These decisions may delineate the right of access to the courts for different groups of inmates, but, when applied, their rulings will interact at times. Read narrowly, the three cases may be thought to yield the following principles:

■ (1) Where a prison provides inmates with adequate assistance from persons

trained in the law, the right to inmate legal assistance, which is premised upon the absence of reasonable alternatives for legal aid, is not applicable. In such a situation, a prison can restrict inmates from giving legal assistance to other prisoners, and the prison is not required to provide an adequate law library.

■ (2) Where a prison does not provide adequate assistance from persons trained in the law, the right to inmate legal assistance applies. In that situation, the prison cannot prohibit inmates from rendering legal assistance to other ignorant, unskilled, untutored or illiterate inmates, and the prison must provide an adequate law library for those capable of using it.

In *Buise, supra,* the Court of Appeals for this circuit appears to agree that the Supreme Court has vindicated at least these minimal guarantees.

3. *Law Library Hours*

■ In their motion for a preliminary injunction, plaintiffs do not contest the adequacy of the materials in the law library. Rather, they argue that the time allowed to use these materials is insufficient to comport with the constitutional requirements announced in *Bounds.* Plaintiffs place special emphasis on the conflict between the law library hours during the week (5:00 p. m. to 9:00 p. m.) and other activities such as college classes and the evening meal. Given the defendants' practice of granting extra library time to inmates facing imminent deadlines, preliminary injunctive relief is not supported by a sufficiently high probability that plaintiffs will ultimately prevail in the contention that the Constitution requires the law library to be open 40 hours, or any other specific number of hours, per week.

4. *Deterring Association among Inmates for the Purpose of Legal Assistance*

A portion of the preliminary injunction sought by plaintiffs would preclude the federal defendants from deterring or continuing to deter associations among the named plaintiffs and other inmates for the purpose

of legal research and writing assistance. For reasons which will appear from the discussion to follow, the record does not contain a sufficient showing that these defendants have engaged in such deterrence, generally. The only serious question is whether such deterrence by the defendants has occurred in the form of a lack of extra access to the law library by the plaintiffs for the purpose of assisting other inmates.

■ Because FCI–Oxford does not provide a legal assistance program to inmates with respect to the highly important matter of lawsuits against the staff, the prison cannot prohibit inmates from rendering legal assistance to ignorant, unskilled, untutored or illiterate prisoners and the prison must provide an adequate law library for those capable of using it. I now hold that ignorant, unskilled, untutored or illiterate inmates have a right of access to an adequate law library through the assistance of other inmates who are able and willing to provide it. This right of access includes access by the helpers at times other than the regular library hours when court deadlines reasonably require it in the cases of ignorant, unskilled, untutored or illiterate inmates. In the present case, in which the prison law library is open 28 hours per week and at least 20 of those hours coincide with other major programs at the institution, and in which there are only two inmates who have established themselves as jailhouse lawyers familiar with basic legal principles and possessed of research and writing skills, it would be unconstitutional for the prison to enforce a policy flatly denying the two jailhouse lawyers additional access to the law library for the purpose of providing assistance to ignorant, unskilled, untutored or illiterate inmates.

The critical question in this case is whether plaintiffs have shown that the persons named as defendants in this case are imposing, or threatening to impose such a restrictive policy. FCI–Oxford Policy Statement OX–2001.1B, parts 5(e) and 7(a), recognizes that extra access to the law library should be granted to inmates faced with imminent

court deadlines in their own cases. It is silent on such extra access by inmates who are willing to assist others.

The record reveals the existence of a resistive attitude, in general, on the part of various staff members toward inmate lawsuits and administrative complaints. Defendants Cleavinger and Ketchum denied plaintiff Wetmore extra time in the law library even though he faced an imminent court deadline. When plaintiffs Wetmore and Skinner requested notary services, staff member Edwards (not a defendant) harassed them by refusing and then delaying his services. Plaintiff Wetmore's legal materials were confiscated from his cell as alleged contraband and a prison officer, Young (not a defendant) teased Wetmore about the incident. Another staff member, Brush (not a defendant), jokingly threatened to kill plaintiff Skinner when Skinner questioned Brush about the opening of some of his legal mail. Inmate Erickson was subjected to derogatory comments about his legal actions by a prison staff member, Johnson (not a defendant). This evidence does not bear directly upon the issue whether defendants have deterred legal assistance among inmates by preventing extra access to the law library by the plaintiffs. It is relevant to the present inquiry, however, for it suggests a disposition on the part of some members of the prison staff to deter associations among the named plaintiffs and other inmates.

More directly to the point is evidence of specific incidents in which staff members have attempted to deter or have threatened to deter inmate legal assistance. Brush denied plaintiff Wetmore extra time in the law library to prepare legal documents for other inmates who faced imminent court deadlines and who had no other source of legal aid. Defendant Cleavinger denied the request of inmate David Muse to use the law library extra hours to prepare a tra-

verse for another prisoner. Edwards threatened plaintiffs Wetmore and Skinner with disciplinary action if, while using the law library pursuant to a grant of extra time, they worked on other prisoners' lawsuits. An unnamed staff member told inmate Randall Redhead that "doors would close, instead of open" for him if he continued his association with jailhouse lawyers. Staff member Webber told inmate Randy Smith that he could get himself into serious trouble by associating with Wetmore and Skinner.[4]

These incidents tend to show a pattern of conduct deterring inmate legal assistance. But with two exceptions, the actors are not parties to this lawsuit. The acts by defendants Cleavinger and Ketchum alone are insufficient to show a pattern of conduct on their part. The question then is whether evidence of alleged misconduct by subordinate employees is sufficient to support a preliminary injunction against their supervisors to prevent similar wrongdoing.

In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court set aside an injunction against police misconduct. The injunction had been entered against a mayor, a city managing director, and a police commissioner, based upon a pattern of police violations by individual police officers not named as parties. The Supreme Court rejected (at 371, 96 S.Ct. at 604) the theory that supervisory governmental officials could be vulnerable to an injunction where

. . . there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization of approval of such misconduct.

The Court also rejected the argument that even without a showing of their direct re-

---

**4.** The transfer of the plaintiffs from their library jobs, which is discussed in detail in the next section of this opinion, may be viewed not only as a violation of the Constitution in itself but as a form of deterrence, generally, with respect to associations among the named plaintiffs and other inmates for the purpose of legal assistance. However, the motion for a preliminary injunction seeks the specific relief of reinstatement, and this portion of the motion is dealt with on its own merits hereinafter.

sponsibility for the incidents of misconduct, governmental officials could be subject to an injunction for their failure to correct or eliminate the pattern of wrongdoing. *Id.* at 376, 96 S.Ct. 598. *See also Monell v. Department of Social Services of the City of New York et al.,* 436 U.S. 658, at 694 n. 58, 98 S.Ct. 2018 at 2037, 56 L.Ed.2d 611 (1978). I cannot escape the conclusion that *Goode* controls the issue of defendants' responsibility for the acts deterring inmate legal assistance.[5] There is no evidence that the acts committed by staff members Edwards, Young, Brush, Webber, and Johnson were authorized or approved, explicitly or implicitly, by defendants Fields, Culley, Cleavinger, Ketchum, or Pugh. Even more clearly, there is no evidence that the defendants have adopted a policy or approved a practice of denying additional access to the law library to inmates able and willing to assist other inmates facing imminent deadlines in their court cases. Plaintiffs have not shown that they are sufficiently likely to succeed on the merits of their claim that defendants are deterring or threatening to deter associations among the named plaintiffs and other inmates for the purpose of legal research and writing assistance. That portion of the motion for a preliminary injunction which seeks to restrain such deterrence cannot be granted.

### 4. Removal of named Plaintiffs from their Positions in Law Library

■ Finally, the preliminary injunction sought would preclude defendants from continuing to exclude plaintiffs from the positions they held on March 14, 1978, in the law library. I have found as fact that plaintiffs' conduct in assisting other inmates with their litigation was a substantial and motivating factor in defendants' decision to transfer them from the law library to other, less desirable, assignments. I have found as fact, also, that plaintiffs

were transferred by the defendants either for the purpose of punishing them for their conduct in assisting other inmates with their litigation or for the purpose of impeding them in providing such assistance, or for both such purposes. Based upon the recent decision in *Buise v. Hudkins* by the Court of Appeals for this circuit, and upon the earlier authorities upon which *Buise* rests, I conclude that, unless defendants are able to carry a certain burden of proof, plaintiffs enjoy a sufficiently good chance ultimately to prevail in their claim for reinstatement. That certain burden of proof which defendants will be required ultimately to meet by a preponderance of the evidence is this: that had the plaintiffs not assisted other inmates with their litigation or had the defendants been wholly unaware of any such conduct on the part of the plaintiffs, the defendants would have reached the same decision to transfer the plaintiffs from their library assignments to the assignments to which in fact they were transferred. *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 284–287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

On the basis of the showing made by the defendants in opposition to the motion for a preliminary injunction, it appears unlikely that the defendants will be able ultimately to make such a showing by a preponderance of the evidence.

When plaintiffs inquired about the reasons for the transfer from the law library at the time it occurred, they were told only that the reasons were administrative, which cannot be considered an explanation, and that "the institution has the authority to abolish, assign, or change work assignment of any individual inmates," which cannot be considered an explanation. Unless I am to assume that those who responded in this way were moved so to respond by an utter lack of respect for the plaintiffs as human

---

5. In holding that a governmental body such as a county cannot be held liable in money damages under 42 U.S.C. § 1983 unless an official policy required the acts which deprived the plaintiff of his or her constitutional rights, *McDonald v. State of Illinois*, 557 F.2d 596, 604 (7th Cir. 1977) and *Jamison v. McCurrie*, 565

F.2d 483, 485 (7th Cir. 1977), the Seventh Circuit cites *Goode* for the "affirmative link" proposition. 565 F.2d, at 485 n. 1. The court does not acknowledge as significant the distinction between the injunctive relief requested in *Goode* and the monetary relief sought in *Jamison.*

beings, an assumption I would be most reluctant to indulge in, there is a strong implication that embarrassment would have arisen from a disclosure of the true reason or reasons.

Only in the defense of this lawsuit was an attempted explanation forthcoming: namely, that the addition of three non-prisoner employees eliminated the need for the plaintiffs' services in the Education Department which was responsible for the law library. It may well be that upon a full trial of this matter, the testimony of the prison officials in support of this explanation will prove more clear and convincing than their statements to date. The statements to date are to the effect that the Education Department had six too many employees; that the three new non-prisoner employees were to perform the tasks which had been performed by the plaintiffs; and that the presence of non-prisoner employees would stop the pilfering and destruction of books in the library. But the connection between the six surplus employees in the Education Department, on the one hand, and the substitution of three new non-prisoner employees for the plaintiffs, on the other, is unexplained. There is no showing that the three new non-prisoner employees did in fact proceed to perform the tasks previously performed by the plaintiffs; on the contrary, so far as it goes, the record supports the inference that when defendants attempted, after the fact, to arrange for this substitution, the attempt failed. As for pilferage and destruction, the record shows only that the plaintiffs had instituted procedures in an attempt to reduce the loss of material from the library.

Moreover, the failure to observe the procedures for transfers contemplated by the institutional Policy Statement, the *ex post facto* attempt to obtain permission to make the appropriate changes in job categories and work details, and the faltering uses of the present and past tenses in that request for permission tend in combination strongly to suggest that defendants will encounter considerable difficulty in meeting their burden at trial.

If defendants fail to meet their burden at trial, an injunction requiring them to reinstate the plaintiffs in their library jobs will be an appropriate remedy. Such an injunction would place plaintiffs in a position no worse than that in which they would have been had they not engaged in constitutionally protected assistance to other inmates with their litigation. *Mt. Healthy City Board of Ed., supra*, 285–286, 97 S.Ct. 568. If defendants fail to meet their burden, for the court to do less than remove the sanction and to reinstate the benefit would permit the defendants to accomplish indirectly what the Constitution forbids them to do directly. *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Therefore, preliminary injunctive relief providing for reinstatement is justified.

I express no opinion concerning the options which will become constitutionally available to the defendants after the reinstatement of the plaintiffs to their positions in the law library.[6]

## III. COMMENT

Outside prison walls, those to whom competent legal advice is available may elect to seek it, instead, from persons not competent to give it. I see no reason why prisoners should not be free to engage in the same folly. But it is unwarranted and even mischievous to entertain the proposition that the availability of help in legal matters from persons untrained in the law is a serious answer, even a serious partial answer, to the tremendous and urgent need of prisoners for competent legal assistance. It is unwarranted because, with occasional exceptions, such help is not true help.[7] It is

6. From references to him in other litigation in this court, it appears that plaintiff Loranger may have been transferred to another institution since this motion for a preliminary injunction was submitted. A representation to this effect is made by counsel for the defendants in a brief submitted on October 12, 1978, but it has not been shown by competent evidence.

7. Whether help from Wetmore, Skinner and Loranger is among the occasional exceptions I cannot say. Although it is of no consequence

mischievous because it tends to stall proper solutions to the problem and because it leads to the necessity for unsatisfactory judicial responses, such as the order I am about to enter. I regret the trend of decision commencing with *Johnson v. Avery.* This trend of decision treats access to legal help from persons untrained in the law not simply as an opportunity for folly which neither prisoners nor non-prisoners can be denied, but as a serious answer or partial answer to prisoner needs. Under certain circumstances this trend of decision even compels the lower courts to compel the prison authorities in turn to lend a suggestion of competence and adequacy to the legal services rendered by persons untrained in the law.

If I were free to do so, I would enter a preliminary injunction requiring the defendants to follow forthwith a straightforward course of action: that is, to arrange for competent legal services for the inmates at FCI–Oxford in cases in which the inmates may desire to sue members of the staff of the institution or officers of the Bureau of Prisons.[8] As I have said earlier, however, I consider myself obliged, at least at the stage of deciding upon interlocutory injunctive relief, to adopt a narrower view of the effect of *Johnson, McDonnell,* and *Bounds.* Adopting that narrower view, I am obliged to limit the preliminary injunction to a provision for the reinstatement of the plaintiffs in their library jobs. .

to the decision on the present motion whether I assume one thing or another, I am prepared to assume the best rather than the worst. That is, I am prepared to assume that each of them has been inspired by a genuine desire to be helpful and that each of them has achieved a certain measure of competence in legal matters. In my comments in this opinion, I do not suggest that law is a thing of impenetrable mystery to those not formally enlisted in the ranks of the profession, nor that all those trained in law are also blessed with wisdom or common sense. I do suggest that one untrained in the law,

though wise and sensible, is severely handicapped in attempting to provide legal assistance.

8. In this case plaintiffs have sought to accomplish this by obtaining an order compelling defendant Dickey to provide such legal services through LAIP. But it is clear that Dickey, a state officer, is no more obliged to provide this service to federal prisoners than any private member of the bar might be. The United States Bureau of Prisons would be the appropriate target of such an order.