PAUL WILLIAM TEDDER, Petitioner-Appellant, *v.* JAMES FAIRMAN *et al.*, Respondents-Appellees.—THOMAS BASS, Petitioner-Appellant, *v.* GAYLE M. FRANZEN *et al.*, Respondents-Appellees.

Fourth District   Nos. 16002, 16041 cons.

Opinion filed March 6, 1981.

CRAVEN, J., concurring in part and dissenting in part.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellants.

William J. Scott, Attorney General, of Chicago (Patricia Rosen and William P. King, Jr., Assistant Attorneys General, of counsel), for appellees.

Mr. JUSTICE GREEN delivered the opinion of the court:

The captioned cases are consolidated on appeal. Both petitioners are inmates at Pontiac Correctional Center and appeal from judgments of the circuit court of Livingston County entered on December 26, 1979, as to petitioner Paul William Tedder in our General No. 16002, and as to petitioner Thomas Bass in our General No. 16041, each dismissing, in bar of action, upon respondents' motions, petitioners' respective complaints. Respondents are various officials and agents of the Illinois Department of Corrections.

The State Appellate Defender was appointed to represent petitioners but has filed a motion to withdraw, asserting that the duties of that office do not include representation of indigent prisoners seeking the type of relief requested here. We have ordered the motion taken with the case. Pursuant to our order, the State Appellate Defender has also filed adversary briefs on behalf of petitioners.

Although the petitions were dismissed for failure to state a cause of action, the complicated problems involved require an extensive recitation of the proceedings in the trial court.

Tedder filed a request as a pauper for appointment of counsel and a petition for *mandamus*, alternatively *habeas corpus*, August 17, 1979. He alleged: (1) he had "bad nerves" causing insomnia; (2) he had been attempting to get "adequate medical attention" from the prison hospital since 1977 and to see a psychiatrist since 1978; (3) he was seen by a psychiatrist on one occasion but the prison administration did not treat him "in accordence [*sic*] with the recommendation of the prison psychatrists [*sic*] prescriptions;" and (4) the lack of treatment was causing him great mental suffering which would become progressively worse. The trial judge appointed the Livingston County public defender to represent Tedder August 20, 1979. The respondents moved to dismiss the petition for failure to state a cause of action (Ill. Rev. Stat. 1979, ch. 110, par. 45) September 24, 1979. According to the motion, *habeas corpus* was inappropriate because Tedder was neither questioning the validity of his conviction nor requesting relief, and *mandamus* was unattainable because Tedder was not requesting the performance of a specific mandatory act, for medical treatment is discretionary. In the alternative, the respondents requested a more definite statement of the acts desired by Tedder, of his legal right to those acts, and of the respondents' past nonfeasance. Tedder moved for a continuance September 27, 1979.

The clerk of the circuit court sent Tedder a letter September 27, 1979,

informing him of the appointment of Thomas Blakeman, an assistant public defender, as counsel.

In a hearing held October 4, 1979, the trial judge granted the respondents' motion to dismiss the *habeas corpus* claim and ordered a more definite statement of facts in the petition for *mandamus*. David Ahlemeyer, the public defender for the county, represented Tedder at that hearing. The docket sheet shows the case continued until November 28, 1979, with Tedder to plead anew by then.

Blakeman wrote to Tedder October 18, 1979, apprising him of the progress in this case and several others. Blakeman wrote that the trial judge had dismissed the *habeas corpus* petition but did not refer to the opportunity to amend the petition for *mandamus*. The letter also told Tedder of the date by which responsive pleadings in the *mandamus* action were due.

On October 25, 1979, the trial judge wrote to Tedder informing him of the development and actions taken in Tedder's seven cases before the court. With regard to this case, 79-MR-53, the trial judge explained that the *mandamus* aspect was continued and that he had been granted leave to amend the *habeas corpus* petition within 10 days, but no amendment was ever filed.

Blakeman appeared for Tedder at the *mandamus* hearing held November 28, 1979. The respondents moved to dismiss the complaint because an amended petition had not been filed. Blakeman said that Ahlemeyer had told him to amend the complaint in 79-MR-62, not 79-MR-53. Blakeman thought that his office rather than Tedder was to blame for the confusion. The trial judge granted a 14-day extension for filing an amended petition and postponed the hearing on the merits until December 26, 1979.

Tedder filed a petition for rehearing, alternatively a notice of appeal, December 18, 1979, apparently on the dismissal of the *mandamus* portion of the original petition, for, as the transcript at the December 26 hearing shows, appointed counsel did not file amended pleadings within the 14-day extension granted in November. According to the petition and a supporting affidavit, Tedder had been in the detention unit at Pontiac since August 2, 1979; Blakeman had refused to go to the prison to discuss the case and the trial judge had denied Tedder's request for appointment of a different attorney. Tedder maintained that his counsel had been ineffective and he had been unable to do his own research or consult with an inmate lawyer. Tedder also contended that he had received no information concerning the defects in his pleadings.

At the hearing held December 26, 1979, Blakeman again appeared on Tedder's behalf. Because an amended petition had not been filed, the trial

judge granted the respondents' motion to dismiss the case with prejudice. Blakeman asked that Tedder's petition filed in December be regarded as a notice of appeal. The court then entered a final order, finding the petition for *habeas corpus* defective because Tedder was not entitled to discharge from custody under section 21 of the *Habeas Corpus* Act (Ill. Rev. Stat. 1979, ch. 65, par. 21). The court found that the part of the petition seeking *mandamus* failed to state a cause of action because it did not "request defendants to perform a specific act. Furthermore, medical treatment of an inmate is a discretionary act and *mandamus* will not lie to order performance of a discretionary act." Tedder's notice of appeal was filed that same day, and the State Appellate Defender was appointed for the appeal.

Bass filed a combined petition for *mandamus*, declaratory relief, and damages on October 25, 1979. It alleged (1) the Institutional Assignment Commission of the Department of Corrections had denied his requests for transfer to other prisons because he had stabbed a guard, been convicted of an escape in 1972 and was aggressive; (2) he had protested the denial by filing a grievance to the Department's Institutional Inquiry Board which deemed his grievance to be without merit; (3) he had never stabbed a guard or been charged with doing so; (4) he felt threatened by gang members who believed that he had informed on them to guards; (5) other prisoners frequently hit him and threw things at him while he went about his work assignment; and (6) he was placed in segregation when he refused to do his assigned work. With regard to *mandamus* relief, Bass requested a transfer to any prison except Stateville or Menard and expungement from his record of the disciplinary reports issued for not performing work and of an unspecified false report—presumably the allegation that he had stabbed a guard. Bass also sought a declaration that the respondents' actions violated the Federal and State constitutions and requested $10,000 in both punitive and compensatory damages.

On October 25, 1979, the trial judge appointed the public defender to represent Bass and scheduled a hearing on motions for November 28, 1979. The State filed a motion to dismiss under section 45 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 45) on November 26, 1979, arguing that the petition did not allege facts sufficient to justify a decree of *mandamus*.

Blakeman represented Bass at the hearing held November 28, 1979, but did not argue against the respondents' motion; the trial judge dismissed the petition, granted Bass leave to amend within 14 days, and scheduled another hearing for December 26, 1979. In a letter to the trial judge dated December 23, 1979, Bass stated that delays in photocopying at the prison library would postpone the filing of his amended pleadings

until around December 31, 1979. A hearing was held on December 26 with Blakeman again appearing on behalf of Bass. The case was dismissed because no amended pleading had been filed.

On December 27, 1979, Bass filed a motion to proceed *pro se* and for the original petition to be construed as a civil action. The trial judge wrote to Bass December 27, 1979, explaining that the action had been regarded as civil all along and that the petition had been dismissed with prejudice for failure to amend the pleadings. Bass filed a notice of appeal January 11, 1980. The trial judge appointed the State Appellate Defender January 14, 1980, to represent Bass on his appeal.

Besides the narrow question whether the trial court erred in dismissing Tedder's and Bass' petitions, we must also decide whether and when prisoners have the right to appointed counsel in both the trial court and on appeal. These additional questions arise not only because of the motion of the State Appellate Defender to withdraw but also because of the problems that would arise in the trial court upon any remand of the case.

■■ The Federal constitutional right of an indigent charged with the commission of a crime to appointed counsel has been recognized since *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792. Similarly, a convicted indigent has the same right to appointed counsel on a first appeal if the appeal is a matter of right (*Douglas v. California* (1963), 372 U.S. 353, 9 L. Ed. 2d 811, 83 S. Ct. 814) but not if the appeal is discretionary. *Ross v. Moffitt* (1974), 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437.

In a number of cases involving family law, the courts have required the appointment of counsel for indigents to protect what is termed basic, fundamental, or significant interests. *Salas v. Cortez* (1979), 24 Cal. 3d 22, 593 P.2d 226, 154 Cal. Rptr. 529, *cert. denied* (1979), 444 U.S. 900, 62 L. Ed. 2d 136, 100 S. Ct. 209, held that appointed counsel was necessary for indigents named as defendants in paternity suits where the State appears on the mother's or child's behalf.

*Flores v. Flores* (Alas. 1979), 598 P.2d 893, held that indigents have a right to appointed counsel in a private not State, child-custody proceeding when the spouse is represented by a public legal aid unit. The court based its result on the due process clause of the Alaska Constitution and rejected the civil/criminal distinction as a guide to what due process requires.

*Department of Public Welfare v. J. K. B.* (1979), ___ Mass. ___, 393 N.E.2d 406, held that indigent parents are entitled to appointed counsel in proceedings brought to dispense with parental consent to adoption. The court relied on due process and analogized the loss of a child to loss of freedom.

*In re E. B.* (1972), 30 N.Y.2d 352, 285 N.E.2d 288, held that due process requires the appointment of counsel in proceedings brought to terminate parental rights.

*Davis v. Page* (5th Cir. 1980), 618 F.2d 374, rejected the case-by-case approach of *Cleaver v. Wilcox* (9th Cir. 1974), 499 F.2d 940, holding that the fourteenth amendment requires the appointment of counsel for all indigent parents in child dependency hearings.

■■ ■ In all of the cases, the indigents deemed to have a right to appointed counsel were defendants or respondents in proceedings where impairment of their important interests were sought. Here, petitioners seek affirmative action in support of their rights and to protect them from allegedly oppressive conditions of their incarceration. Important constitutional rights could be involved, because a deliberate indifference upon the part of prison officials to an inmate's serious illness or injury could cause his incarceration to be cruel and unusual punishment in violation of the eighth amendment. (*Estelle v. Gamble* (1976), 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285.) The failure of prison personnel to protect a prisoner from other inmates could become so gross as to also constitute a similar eighth amendment violation.

No United States Supreme Court, United States Circuit Court of Appeals, or Illinois court of review case has been called to our attention which holds an indigent person to have a constitutional right to have counsel appointed where, as here, affirmative action in support of the indigent's rights is sought rather than a defense to actions seeking to diminish those rights.

In a series of cases beginning with *Ex Parte Hull* (1941), 312 U.S. 546, 85 L. Ed. 1034, 61 S. Ct. 640, the United States Supreme Court has developed a theory that prisoners, including those who are indigent, have a constitutional right of access to the courts to take affirmative action in support of their important interests. *Hull* invalidated a prison regulation that required prisoners to submit their *habeas corpus* petitions to prison authorities, who in their discretion could refuse to file them in court. In *Johnson v. Avery* (1969), 393 U.S. 483, 21 L. Ed. 2d 718, 89 S. Ct. 747, the court held that in the absence of alternative means of legal assistance, prisons could not prohibit jailhouse lawyers from helping other inmates in drawing up *habeas corpus* petitions.

In the foregoing cases, the inmates sought access to the courts in order to seek issuance of writs of *habeas corpus* bringing about their release from custody. In *Wolff v. McDonnell* (1974), 418 U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963, the court held inmates to have a right to access to the courts to obtain relief from the incidence of their confinement under certain provisions of the Federal Civil Rights Act (42 U.S.C. §1983 (1976)). The relief sought here is of that type. However, even in *Wolff* the

decision only prevented the authorities from hindering the prisoners access to the courts. None of them required that affirmative steps be taken to aid the prisoners, although waiver of docketing fees (*Smith v. Bennett* (1961), 365 U.S. 708, 6 L. Ed. 2d 39, 81 S. Ct. 895), and transcript costs (*Griffin v. Illinois* (1956), 351 U.S. 12, 100 L. Ed. 891, 76 S. Ct. 585) have been required.

The seed for a requirement that prisoners receive help arose from *Younger v. Gilmore* (1971), 404 U.S. 15, 30 L. Ed. 2d 142, 92 S. Ct. 250, where the court relied on *Avery* to affirm, in a *per curiam* decision, *Gilmore v. Lynch* (N. D. Cal. 1970), 319 F. Supp. 105. The district court ordered the Department of Corrections in California to expand its prison law libraries or provide other means of legal assistance. Both the right of access and equal protection formed the basis for the decision. 319 F. Supp. 105, 109.

The issues of *Gilmore* were thoroughly discussed in the subsequent case of *Bounds v. Smith* (1977), 430 U.S. 817, 828, 52 L. Ed. 2d 72, 83, 97 S. Ct. 1491, 1998, where, again a Federal District Court had required a State to provide its indigent prisoners with either (1) an adequate law library, or (2) adequate assistance of "persons trained in the law" to enable them to prepare *habeas corpus* petitions and civil rights complaints. The dissent of Mr. Justice Stewart joined in by Mr. Chief Justice Burger questioned the effectiveness of law libraries as an aid to most prisoners who were relatively unsophisticated. The opinion seemed to focus upon the problem of aiding prisoners in the preparation of initial pleadings for filing and did not discuss the prosecution of the cases thereafter.

Some writers and some Federal District Courts (*Glover v. Johnson* (E.D. Mich. 1979), 478 F. Supp. 1075; *Wetmore v. Fields* (W.D. Wis. 1978), 458 F. Supp. 1131; *Thibadoux v. LaVallee* (W.D. N.Y. 1976), 411 F. Supp. 862) have also questioned whether indigent prisoners can adequately proceed in these types of cases without counsel and have indicated that such prisoners have a Federal constitutional right to appointed counsel in such cases. We share this concern, but we also recognize the substantial problems that would arise if we should hold that such indigent prisoner had a constitutional right to appointed counsel in each case of this nature. In view of the limited precedent in support of such a ruling, we decline to so hold.

Because of the consequences of a ruling requiring appointment of counsel as a constitutional right, we conclude that such a holding, if it is to be made, should only come from the State's highest court.

Any estimate as to the number of lawyers that would be necessary to furnish counsel for prisoners in these cases is inherently conjectural. Certainly in many counties of the State having penal institutions neither the public defender service (if that entity could be appointed) nor the private bar would be adequate to meet the requirement. The task of

affirmatively presenting matters on behalf of prisoners, as involved here, could well be more difficult than defending persons charged with crime or attempting to overcome their convictions. The theories of relief are uncertain and the marshaling of evidence is often difficult. The frustrations of public defenders faced with a substantial number of similar cases may have been the cause of much of the problem in the trial court here. Regardless of whether public defenders or private counsel were appointed, the expense of providing counsel would fall upon the counties where the institutions are located under present law. If appointment of counsel were required, an orderly procedure for the handling of the appointments would be helpful. (See Turner, *When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts,* 92 Harv. L. Rev. 610 (1979).) Implementation of a decision to appoint counsel would be most desirable.

Only the supreme court has the administrative and rule-making power to provide for an orderly system for appointment of counsel and for providing for a system that would apportion the burden of providing counsel evenly throughout the State. Only a decision by that court would stimulate any implementing legislation necessary.

Under Federal procedure there is a provision whereby the district court must appoint counsel for an indigent prisoner in *habeas corpus* cases after the court has examined the prisoner's petition and determined that an evidentiary hearing will be required. (28 U.S.C.A. foll. §2254 Rule 8(c) (1977).) Although the instant cases involve request for *habeas corpus* relief, they more clearly resemble cases for violations of civil rights under section 1983 of the Civil Rights Act (42 U.S.C. 1983 (1976)). There is no provision for appointment of counsel for indigents in the Federal courts in cases of that nature.

No Illinois case has held the Illinois statutory provisions for appointment of counsel for indigents to be applicable to cases of this nature. The mandate to the State Appellate Defender to represent indigents "on appeal in criminal cases" (Ill. Rev. Stat. 1979, ch. 38, par. 208—10(a)) is clearly not applicable to cases of this nature. The general mandate to the county public defender is not as clear. With reference to that officer's appearance in other than juvenile cases it states:

> "The Public Defender, as directed by the court, shall act as attorney, without fee, before any court within any county for all persons *who are held in custody* or who are charged with the commission of any criminal offense, and who the court finds are unable to employ counsel." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 34, par. 5604.)

In *People ex rel. Ross v. Ragen* (1945), 391 Ill. 419, 63 N.E.2d 874, the supreme court denied the request of a petitioner before it on an original

petition for writ of *habeas corpus,* for appointed counsel. Legislation similar to that above with reference to the duties of the public defender was then in existence. Without referring specifically to that legislation, the court stated:

> "By every constitutional and statutory provision, the right and duty of the court to appoint counsel for indigent persons is limited to criminal prosecutions in which the accused is charged with crime." (391 Ill. 419, 422, 63 N.E.2d 874, 875.)

In *People ex rel. McGuire v. Sympson* (1974), 20 Ill. App. 3d 139, 312 N.E.2d 854, in the face of the present provision for the duties of the public defender but without referring to it, the appellate court upheld a trial court's denial for appointment of counsel for an indigent *habeas corpus* petitioner seeking discharge from imprisonment. *Ross* was cited.

The Attorney General has recently issued an opinion holding that appointment of counsel for indigent petitioners in cases of the nature before us is neither required nor proper. (Ill. Att'y Gen. Op. 80-026.) It cites the existing statutory designation of duties of the county public defender and then points out that the various specific references to appointment of the public defender or appellate defender made no mention of appointment in cases of this nature. (Ill. Rev. Stat., 1979 Supp., ch. 38, par. 113—3; Ill. Rev. Stat. 1979, ch. 38, pars. 121—13, 122—1, 122—4.) *Ross* and *McGuire* were also cited.

The motion of the appellate defender to withdraw is allowed.

As we subsequently explain, we also hold petitioners to be entitled to reversal of the orders appealed and remandment to the circuit court. Accordingly, we need not give them an opportunity to obtain other counsel or to file *pro se* briefs.

The complaint filed by Tedder was drafted *pro se.* Appointed counsel made no amendments to it. In reviewing the dismissal of a prisoner's *pro se* complaint for failure to state a cause of action, the inmate's "inartfully pleaded" allegations should be viewed under "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner* (1972), 404 U.S. 519, 520, 30 L. Ed. 2d 652, 654, 92 S. Ct. 594, 596; *Estelle v. Gamble* (1976), 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285.

As we have stated, deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment. (*Estelle.*) Tedder sought relief to obtain medical aid by way of *mandamus.* While determination of whether an inmate needs medical attention may be a discretionary matter and officials' actions in regard to discretionary matters do not ordinarily give rise to a right to *mandamus,* that writ has been ordered to be proper when an exercise of governmental power is extremely arbitrary and results in a manifest injustice. (*Illinois State Board of Dental Examiners v. People ex rel. Cooper* (1887), 123 Ill. 227, 13 N.E.

201; *Kermeen v. City of Peoria* (1978), 65 Ill. App. 3d 969, 382 N.E.2d 1374; *People ex rel. Shell Oil Co. v. City of Chicago* (1972), 9 Ill. App. 3d 242, 292 N.E.2d 84.) In *State ex rel. Thomas v. State* (1972), 55 Wis. 2d 343, 198 N.W.2d 675, *mandamus* was held to lie to compel prison authorities to furnish medical attention when prison authorities' discretion in determining whether to furnish such treatment had been exercised arbitrarily or abusively.

■■ Determination of whether prison authorities have abused their discretion in such a way as to work a substantial injustice by refusing medical treatment to an inmate complaining of nervousness and insomnia would be a difficult task for a court. But we cannot determine that the situation alleged by Tedder could not give rise to a cause of action in *mandamus* if properly pleaded. Moreover, regardless of the limitations of such a statutory procedure as *mandamus*, if a prison official deprives a prisoner of constitutional rights, the prisoner is entitled to a procedure to alleviate that condition. Federal legislation provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C.A. §1983 (1976).

The remedy under section 1983 above is more plenary than that existing under traditional special common law or statutory proceedings. State courts in some States have held that they have jurisdiction of such cases. (*Williams v. Horvath* (1976), 16 Cal. 3d 834, 548 P.2d 1125, 129 Cal. Rptr. 453; *Brown v. Pitchess* (1975), 13 Cal. 3d 518, 119 Cal. Rptr. 204, 531 P.2d 772; see also *Bennun v. Board of Governors* (D. N.J. 1976), 413 F. Supp. 1274; *Luker v. Nelson* (N.D. Ill. 1972), 341 F. Supp. 111, 116.) In *Luker*, the opinion stated that the notice provision of the Illinois legislation concerning tort actions against governmental units was not applicable to section 1983 actions brought in either State or Federal courts. Other decisions have indicated that State courts are without jurisdiction of such cases. (*Chamberlain v. Brown* (1969), 223 Tenn. 25, 442 S.W.2d 248; *Beauregard v. Wingard* (S.D. Cal. 1964), 230 F. Supp. 167.) Whether Illinois courts have jurisdiction of such cases is not before us at this time.

The record indicates that the public defender was burdened with a substantial number of similar cases at the time the order dismissing Tedder's complaint was entered. Considering the confusion then existing, the apparent belief of the court and trial counsel that no cause of action could be shown entitling a prisoner to relief for prison authorities' failure

to furnish medical care and the "less stringent" pleading standards for prisoners' complaints (*Haines*), we conclude that Tedder is entitled to amend his complaint if he can, in good faith, plead a cause of action. We reverse and remand for that purpose.

■■ The petition filed by Bass indicates less chance of being meritorious than that of Tedder. Prison officials have wide discretion in deciding upon transfers in the penal system. (*Montanye v. Haymes* (1976), 427 U.S. 236, 49 L. Ed. 2d 466, 96 S. Ct. 2543; *Meachum v. Fano* (1976), 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532.) However, confinement in a dangerously hostile place could be so dangerous to the inmate as to violate his eighth amendment protection against cruel and unusual punishment and require some action on the part of prison officials, not necessarily transfer, to protect the inmate. As Bass' petition was dismissed for failure to timely file in the face of his claim that equipment breakdown at the prison prevented him from timely filing, we also reverse the judgment dismissing his petition and remand to allow him to amend if he can, in good faith, stating a cause of action.

We have held that indigent prisoners bringing suits of the nature here have no right to appointed counsel either at trial or on appeal. However, if they show that they have been deprived of both access to an adequate law library and the assistance of "persons trained in the law," *Bounds v. Smith* (1977), 430 U.S. 817, 52 L. Ed. 2d 72, 97 S. Ct. 1491, would require that counsel be appointed. Under our ruling here, that counsel would have to come from the private bar.

Motion of State Appellate Defender to withdraw allowed; reversed and remanded.

MILLS, J., concurs.

Mr. JUSTICE CRAVEN, concurring in part and dissenting in part:

I agree with the majority that these two cases must be remanded but part company on what should be done after remand with regard to prisoners' rights and particularly the right to counsel. Remand under the majority's limits will not vindicate any constitutional rights of prisoners and will in fact only frustrate those rights by the mandated judicial wheel-spinning.

Among litigants generally, prisoners have unique and monumental legal problems resulting from their incarceration. Prisoners face special difficulties in securing representation by counsel; cut off from many of the usual sources of legal aid because of the location of prisons in largely rural areas and because they are unable to go looking for attorneys, prisoners must rely on themselves or on jailhouse lawyers to do research,

to draft pleadings, and to conduct a case. The fact of incarceration spawns a multitude of constitutional claims against the government in its role as prison-keeper, for incarceration transforms mundane legal disputes into questions regarding the permissible extent of the State's control over individuals. As the Supreme Court has observed:

"For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State." *Preiser v. Rodriguez* (1973), 411 U.S. 475, 492, 36 L. Ed. 2d 439, 451, 93 S. Ct. 1827, 1837.

By definition no other group in society is so lacking in freedom; prisoners pass each controlled day deprived of many liberties that persons on the outside take for granted:

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." (*Price v. Johnston* (1948), 334 U.S. 266, 285, 92 L. Ed. 1356, 1369, 68 S. Ct. 1049, 1060.)

Yet persons do not lose all their constitutional rights by reason of incarceration. (*Wolff v. McDonnell* (1974), 418 U.S. 539, 555-56, 41 L. Ed. 2d 935, 950-51, 94 S. Ct. 2963, 2974, listing religious freedom, freedom from racial discrimination, and the rights of due process and access as retained by prisoners; *Saunders v. Packel* (E.D. Pa. 1977), 436 F. Supp. 618, 622.) The State may limit the exercise of rights when necessary to preserve order in the prison (*e.g., Pell v. Procunier* (1974), 417 U.S. 817, 41 L. Ed. 2d 495, 94 S. Ct. 2800, upholding a prison regulation that prohibited journalists from interviewing prisoners face-to-face; *Jones v. North Carolina Prisoners' Labor Union, Inc.* (1977), 433 U.S. 119, 53 L. Ed. 2d 629, 97 S. Ct. 2532, upholding restrictions on prisoners' associational rights), but prisoners retain rights to the extent that the rights do not interfere with the needs of incarceration.

Although courts are generally loathe to interfere in the details of prison administration—a "hands-off" approach characterizes the customary judicial attitude toward prison authority—the courts, both State and Federal, will inject themselves into the business of incarceration when prison administrators violate or threaten prisoners' constitutional rights. (*Procunier v. Martinez* (1974), 416 U.S. 396, 405-06, 40 L. Ed. 2d 224, 236, 94 S. Ct. 1800, 1807-08.) Ensuring access to the courts is one area where the judicial system has been notably active in reviewing prison procedures. In a line of cases beginning with *Ex parte Hull* (1941), 312 U.S. 546, 85 L. Ed. 1034, 61 S. Ct. 640, the Supreme Court has gradually broadened

the meaning of prisoners' right of access to the courts. *Hull* invalidated a prison regulation that required prisoners to submit their *habeas corpus* petitions to prison authorities, who in their discretion could refuse to file them in court. In *Johnson v. Avery* (1969), 393 U.S. 483, 21 L. Ed. 2d 718, 89 S. Ct. 747, the court held that in the absence of alternative means of legal assistance prisons could not prohibit jailhouse lawyers from helping other inmates draft *habeas corpus* petitions. Although concerned with the effect of the rule against inmate assistance on the rights of illiterate inmates (393 U.S. 483, 487, 21 L. Ed. 2d 718, 722, 89 S. Ct. 747, 749-50), the court based its decision on the right of access to present petitions rather than on equal protection. In *Younger v. Gilmore* (1971), 404 U.S. 15, 30 L. Ed. 2d 142, 92 S. Ct. 250, the court relied on *Avery* to affirm, in a *per curiam* decision, *Gilmore v. Lynch* (N.D. Cal. 1970), 319 F. Supp. 105. The district court had ordered the department of corrections in California to expand its prison law libraries or provide other means of legal assistance. Both the right of access and equal protection formed the basis for the decision. (319 F. Supp. 105, 111.) With the Supreme Court's affirmance, prison authorities not only had to cease interfering with prisoners' access but also had to take affirmative steps to provide inmates with access. (Potuto, *The Right of Prisoner Access: Does Bounds Have Bounds?* 53 Ind. L.J. 207, 210 (1977-78).) *Wolff* held that the right of access is not limited to prisoners filing *habeas* petitions; the right extends to section 1983 actions as well.

In *Bounds v. Smith* (1977), 430 U.S. 817, 821, 52 L. Ed. 2d 72, 78, 97 S. Ct. 1491, 1494, the court reaffirmed its result in *Gilmore*, saying, "It is now established beyond doubt that prisoners have a constitutional right of access to the courts." The court specifically held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." (430 U.S. 817, 828, 52 L. Ed. 2d 72, 83, 97 S. Ct. 1491, 1498.) Thus, the court was not faced with and did not answer the question whether prisoners are entitled to counsel after the papers have been filed; the "main concern" in *Bounds* was with prisoners' preparation of actions, not with legal assistance after the documents have been drafted. 430 U.S. 817, 828 n.17, 52 L. Ed. 2d 72, 83 n.17, 97 S. Ct. 1491, 1498 n.17.

*Ross v. Moffitt* (1974), 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437, held that counsel was not required for criminal defendants seeking discretionary review of their convictions; *Bounds* found *Ross* inapplicable because prisoners' claims concern new causes of action raising questions that have not already been considered. *Bounds*, 430 U.S. 817, 827, 52 L. Ed. 2d 72, 82, 97 S. Ct. 1491, 1497-98.

I caution against reading *Bounds* as presenting prisons with a choice between mutually exclusive alternatives. Such a narrow reading has been criticized and at the least should not be extended to prisoners who have already prepared their claims and are awaiting action by the courts. After the preparation stage, counsel is needed to respond to the opposing party's motions as well as to provide personal representation in court. Simply put, many courts do not believe that a narrow and parsimonious interpretation of *Bounds* can satisfy the due process requirements of prisoners litigating the conditions of their confinement. *Wetmore v. Fields* (W.D. Wis. 1978), 458 F. Supp. 1131, 1142, said:

> "So radically and massively does government assault individual freedom when it engages in imprisonment that, in my view, the due process clause should be held to require that through the weeks, months, and years, prisoners be afforded abundant and effective means to mount challenges to particular conditions of confinement for resolution by the judicial branch. Without regard to the degree of formal education, intellectual powers, or gifts of expression of a particular prisoner, he or she should be constitutionally entitled to a choice among: adequate assistance from persons trained in the law, direct access to truly adequate law libraries, and the opportunity for assistance from fellow prisoners with legal research and writing."

*Wetmore* then advised against reading *Bounds* as presenting a narrow choice, but adopted a narrow reading itself, however, because the relief sought was an interlocutory injunction.

*Glover v. Johnson* (E.D. Mich. 1979), 478 F. Supp. 1075, found adequate a law library at a women's prison in Michigan but ordered the authorities to permit inmates to assist each other in legal matters, to continue a legal service program, and to establish a legal education program. (478 F. Supp. 1075, 1096-97.) In concluding that the existence of an adequate library would not provide prisoners with meaningful access to the courts, *Glover* advised against reading *Bounds* too narrowly and doubted that prisoners "unschooled in the most basic techniques of legal research" would derive much benefit from a library of law books. 478 F. Supp. 1075, 1096.

*Thibadoux v. LaVallee* (W.D. N.Y. 1976), 411 F. Supp. 862, 864, declined to reopen the question of a prisoner's conviction—other courts and judges had already dismissed a number of *habeas corpus* petitions in the same case—but recommended that prisoners be provided with appointed counsel:

> "This case presents an unfortunate example of the difficulties and frustrations experienced by a convicted defendant who does not have reasonable access to legal counsel to assist him in

presenting his legal argument to the court. Simply to provide penal institutions with law libraries and the aid of inmate legal clerks is not enough. There must be some opportunity for inmates to have access to counsel who would be able to assess the validity of the constitutional deprivations which they have suffered in their convictions."

*Wade v. Kane* (E.D. Pa. 1978), 448 F. Supp. 678, 684, *aff'd* (3d Cir. 1979), 591 F.2d 1338, also decided that the choice suggested by *Bounds* does not mean that a prison need provide only a library or in the alternative other forms of assistance; *Wade* held that even when the prison provides an adequate library, inmates unable to conduct their own research have a right to assistance from other inmates. *Avery* thus was not affected by *Bounds*.

Books ameliorate but alone do not solve prisoners' legal problems:

"The central question in evaluating whether a law library adequately provides meaningful access to the courts is whether the facility will enable the prisoners to fairly present their complaints to a district court. It is not enough simply to say the books are there, when the plaintiffs contend that they do not have the assistance necessary to use the books properly. All of the circumstances must be evaluated in determining the adequacy of a library, and the district court erred by holding that a prison library without any assistance in its use sufficed to provide access to the courts for all the prisoners detained." *Cruz v. Hauck* (5th Cir. 1980), 627 F.2d 710, 720.

Thus, the alternatives in *Bounds* do not independently and alone satisfy the due process right of access; the presence of a law library does not necessarily guarantee every prisoner access to the courts. *Cruz* continued:

"Although *Bounds* says that either an adequate law library *or* assistance from persons trained in the law may satisfy the fundamental constitutional right to access to the courts, the fundamental concern is still whether the inmates have *meaningful* access to the courts. Library books, even if 'adequate' in number, cannot provide access to the courts for those persons who do not speak English or who are illiterate. Library-use assistance might solve the problem presented. Perhaps, instead, the need might be met by 'writ-writers' in the jail, if sufficient in number, to aid those unable to use the library themselves." 627 F.2d 710, 721.

The handicaps and difficulties usually attending *pro se* representation are intensified when the litigant is in prison. Incarceration may inhibit discovery, limit the prisoner's research of the facts and the law, and cause

difficulties in scheduling and attending pretrial hearings. (Robbins and Herman, *Litigating Without Counsel: Faretta or for Worse*, 42 Brooklyn L. Rev. 629, 679 (1976).) For access to be meaningful, then, prisons must provide more than just libraries for prisoners asserting constitutional claims. It is a mistake to read *Bounds* as a repudiation of the principles announced in cases such as *Avery* and *Wolff*. Although the choice given by *Bounds* to prisons may suggest that choosing one of the options satisfies prisoners' right of access, *Bounds* does not hold that *Avery* and *Wolff* are no longer good law but instead cites them as examples of the court's growing recognition of the right and of the manners in which it may be effected.

Thus, problems for illiterate or unschooled prisoners are particularly acute if providing only a library is deemed to satisfy the prison's obligation to make access meaningful. (Note, 26 Kan. L. Rev. 636, 649 (1978).) Books "are worthless to prisoners who lack the reading and writing skills or legal understanding to use them. [Citation.] Access to law books is no substitute for the counseling and drafting that must go into the preparation of litigation. While *Bounds* addressed itself only to the preparation stage, assistance in court is equally indispensable." (Turner, *When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts*, 92 Harv. L. Rev. 610, 656 n.216 (1979).) Turner recommends that prisons provide inmates with legal assistance in both the preparation and litigation of their actions. (92 Harv. L. Rev. 610, 652.) Providing counsel may actually reduce the number of prisoners' suits, because frivolous complaints will be weeded out more quickly and attorneys will advise their inmate-clients to exhaust whatever information remedies are available. 92 Harv. L. Rev. 610, 636.

The majority argues that the right to appointed counsel is limited to criminal matters and generally inapplicable to civil litigants. Yet the constitutional foundation for the right of access as well as the historical and conceptual grounds of the civil/criminal distinction show that the right to appointed counsel is not exclusively criminal.

The right of access has been derived from several constitutional sources, including the first amendment right to petition the government for redress (*Hall v. Maryland* (D. Md. 1977), 433 F. Supp. 756; *Thompson v. Bond* (W.D. Mo. 1976), 421 F. Supp. 878) and the sixth amendment (*Stover v. Carlson* (D. Conn. 1976), 413 F. Supp. 718). The Supreme Court itself has located the right for prisoners as an element of due process:

> "The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary

allegations concerning violations of fundamental constitutional rights." (*Wolff*, 418 U.S. 539, 579, 41 L. Ed. 2d 935, 964, 94 S. Ct. 2963, 2986.)

Because the due process clause rather than the sixth amendment provides the source for the right of access, the civil/criminal distinction is irrelevant in limiting the scope of that right.

The sixth amendment, unlike the seventh, contains a clause guaranteeing the assistance of counsel. Depriving indigent civil litigants of counsel has been attacked on both historical and conceptual grounds; the sixth amendment's express recognition of a criminal defendant's right to retain counsel was a reaction to the then-current English practice of prohibiting certain categories of criminal defendants from appearing in court with counsel. Originally, English felons did not have the right to appear with counsel, although misdemeanants and civil litigants had that right. In 1688 persons charged with treason became entitled to the right to retain counsel, but not until 1836 was this right extended to include all felons. (*Powell v. Alabama* (1932), 287 U.S. 45, 60, 77 L. Ed. 158, 166, 53 S. Ct. 55, 61; Comment, 66 Colum. L. Rev. 1322, 1327 (1966).) The sixth amendment rejected the English rule; *Powell* said:

> "If recognition of the right of a defendant charged with a felony to have the aid of counsel depended upon the existence of a similar right at common law as it existed in England when our Constitution was adopted, there would be great difficulty in maintaining it as necessary to due process." 287 U.S. 45, 60, 77 L. Ed. 158, 166, 53 S. Ct. 55, 61.

*Powell* decided that the phrase in the sixth amendment referring to the assistance of counsel required that counsel be appointed to represent indigents in capital cases; the court based its decision on due process:

> "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law." (287 U.S. 45, 68-69, 77 L. Ed. 158, 170, 53 S. Ct. 55, 64.)

The intricacies of the law thus require the appointment of counsel to represent persons charged with capital offenses. The court went on to state the need for counsel in civil cases:

> "If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." (287 U.S. 45, 69, 77 L. Ed. 158, 170-71, 53 S. Ct. 55, 64.)

If a person who has retained an attorney cannot get a fair hearing without

the presence of his counsel, then the same applies to a prisoner unable to secure counsel in the first place. (See Comment, 76 Yale L.J. 545, 549 (1967).) *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, required on due process grounds the extension of *Powell* to criminal defendants generally. These due process concerns point out the conceptual reasons for appointing counsel to represent prisoners in their challenges to the conditions of their confinement. See *Payne v. Superior Court* (1976), 17 Cal. 3d 908, 553 P.2d 565, 132 Cal. Rptr. 405, holding that indigent prisoners sued in civil actions have a right to appointed counsel.

In rejecting requests for the appointment of counsel in civil matters, courts have often relied on the civil/criminal distinction and the supposition that only criminal defendants have that right. (*E.g., Hubbard v. Montgomery* (Ala. 1979), 372 So. 2d 315; *Wilson v. Swing* (M.D. N.C. 1978), 463 F. Supp. 555.) Yet the distinction is artificial; denominating a proceeding as "civil" rather than "criminal" does not mean that due process and equal protection are inapplicable. (*Hudson v. Miller* (1979), 119 N.H. 141, 399 A.2d 612.) As *Powell* made clear in discussing civil litigants' right to appear with counsel, due process is not confined to criminal cases. See also *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068; *Goldberg v. Kelly* (1970), 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011.

The civil/criminal distinction has been breached by cases such as *Flores v. Flores* (Alas. 1979), 598 P.2d 893, and *Salas v. Cortez* (1979), 24 Cal. 3d 22, 593 P.2d 226, 154 Cal. Rptr. 529. Due process is a flexible concept; the demands of due process depend upon the nature of the litigant's interest in the proceeding, the potential burdens on the State in supplying greater or lesser procedural safeguards, and the type of action involved. (*Goldberg; Fuentes v. Shevin* (1972), 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983.) Because this conception of due process involves weighing the litigant's and the State's interests, it is not surprising that when significant or fundamental interests are involved, a particular civil litigant may be entitled to protections greater than those afforded litigants generally. (Note, 90 Harv. L. Rev. 1029, 1035 (1977).) The decisions such as *Flores*, *Salas*, and *Payne*, granting counsel to indigent litigants, reflect this recognition that the formal denomination of a matter as "civil" or "criminal" does not limit due process. See *Sandoval v. Rattikin* (1966), 385 U.S. 901, 17 L. Ed. 2d 132, 87 S. Ct. 199, where Justice Fortas, joined by Justice Douglas, dissented from the denial of *certiorari*. The petitioners in that case were illiterate indigents who spoke only Spanish; the case raised a due process question concerning their ability to present evidence.

Claims challenging the constitutionality of the conditions under which persons in our society are confined present questions of great importance to the prisoners bringing those actions. The State's interest in

denying them counsel is based mainly on the resulting cost. Estimates of the number of attorneys needed to represent all prisoners in the United States range from approximately 900 (*Tentative Draft of Standards Relating to the Legal Status of Prisoners*, 14 Am. Crim. L. Rev. 377, 428 (1977)), based on 1970 census data and allotting one attorney to every 400 prisoners, to approximately 500 (*Bounds*, 430 U.S. 817, 831-32, 52 L. Ed. 2d 72, 85, 97 S. Ct. 1491, 1500). Yet the constitutional right of access to the courts may not be completely denied on the basis of cost alone (*Bounds*, 430 U.S. 817, 825, 52 L. Ed. 2d 72, 81, 97 S. Ct. 1491, 1496), and we should not do so here. Problems involved in organizing legal representation for prisoners and paying the necessary attorneys are legislative rather than judicial.

The American Bar Association's final draft of standards regarding prisoners' rights, although not recommending the appointment of counsel, calls for the maintenance of adequate law libraries regardless of the availability of other legal services, and thus does not read *Bounds* narrowly. ABA Standards, Legal Status of Prisoners §§2.1 through 2.3 (1981).