Sanford Norman HARRIS, Plaintiff,

v.

Neal D. MacDONALD, et al., Defendants.

No. 81 C 2373.

United States District Court, N.D. Illinois, E.D.

Dec. 29, 1982.

See also 532 F.Supp. 36.

Robert M. Hodge, Chicago, Ill., for plaintiff.

Tyrone C. Fahner, Illinois Atty. Gen., John J. Curry, Jr., Asst. Atty. Gen., Sp. Litigation Div., Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Sanford Norman Harris ("Harris"), a prisoner at Stateville Correctional Center

("Stateville"), brings this 42 U.S.C. § 1983 ("Section 1983") and habeas corpus (28 U.S.C. § 2254) action against Stateville Warden Richard DeRobertis ("DeRobertis"), Sheridan Correctional Center ("Sheridan") Warden Neal MacDonald ("MacDonald"),[1] Illinois Department of Corrections ("IDOC") Director Michael Lane ("Lane") and three other state officials who were members of the Sheridan Adjustment Committee (the "Committee") that presided over Harris' disciplinary hearing. Harris asserts defendants committed both substantive and procedural constitutional infractions in first disciplining him and then transferring him from medium security prison Sheridan to maximum security facility Stateville.

Three motions are now pending:

1. defendants' motion to dismiss Harris' Third (and current) Amended Complaint (the "Complaint"); and

2 and 3. cross-motions for summary judgment brought in connection with the Second Amended Complaint.

For the reasons stated in this memorandum opinion and order, both defendants' motions are granted in part and Harris' is denied in its entirety.

### Facts [2]

On October 17, 1980 William Hiser, the head of Sheridan's Internal Affairs unit, summoned Harris into his office for questioning by an Illinois Department of Law Enforcement ("IDLE") investigator as to Harris' alleged delivery of illegal drugs to another inmate. Harris denied the allegations.

Convinced of Harris' complicity in the drug transaction, on December 9, 1980 prison officials served a disciplinary "ticket" on Harris charging him with violations of several sections of Administrative Regulation ("A.R.") 804. Next day the Committee[3] called Harris in to consider the charges. On his motion it granted a 20-day continuance to December 30. However, on the continued hearing date the Committee refused to allow Harris to make either an oral or written presentation of his defense. After Harris left the hearing two other inmates testified. One of the two, inmate Wembley, executed two affidavits that same day claiming he had testified as to Harris' innocence. At no point did the Committee ever disclose to Harris the existence of such exculpatory evidence.

After the hearing the Committee found Harris guilty of violating four sections of A.R. 804. Three of the violations involved drug use, possession or delivery, while the fourth was for "[d]isobeying . . . any prison rule." A.R. 804.II.A.1(1). Harris was penalized with 30 days' segregation, the loss of 30 days' good time, demotion to "C" grade (from which grade Harris could not earn good time) for 90 days and transfer from Sheridan to Stateville.

Though the pleadings and supporting affidavits are somewhat unclear, it appears Harris received "segregation status" immediately after the Committee's December 30 decision. Because Sheridan lacks separate segregation facilities, segregation is typically accomplished by locking the prisoner in his own cell and thus depriving him of general population privileges (principally his access to various institutional facilities). Anderson Aff. ¶ 3. Apparently Harris was so kept in his own cell until January 12,

---

1. Harris has mistakenly named MacDonald in the Third Amended Complaint and some recent filings as "McDonald." This opinion however adheres to the correct spelling (which was indeed used in the original Complaint).

2. As is appropriate in a summary judgment context, this factual account reflects the uncontroverted content of the documentary materials and supporting affidavits tendered by both parties. Most of this information has been submitted since this court rendered its first opinion in this case, *Harris v. MacDonald*, 532 F.Supp. 36 (N.D.Ill.1982) ("Opinion I"). Consequently, this factual account differs in several critical respects from Opinion I's version, which (as required on a motion to dismiss) was drawn entirely from the Complaint's allegations.

3. All members of the Committee are named as defendants: Lois Partak, Eugene Hapke and Curtis Cattrell.

1981, when Sheridan officials moved him to another cell (C.L. # 3).[4]

On January 29, 1981—his scheduled "out-date"—Harris was taken off segregation status and his cell was unlocked.[5] Though he remained in the same cell for another five days, his living conditions did not materially diverge from those of his fellow prisoners in the general population. Each cell at Sheridan (including C.L. # 3) at that time was "substantially the same in terms of size, condition, and fixtures" and had "substantially the same access to institutional facilities available to prisoners in the general population." Anderson Aff. ¶¶ 4, 5.

On February 3 Sheridan authorities returned Harris to his old cell. His stay was short-lived however, for he was transferred to Stateville on February 8. Though the parties dispute this issue, for present purposes it will be assumed Harris was not accorded any pre-transfer hearing.

On February 27 Sheridan's Inquiry Board rejected Harris' grievance. But on May 13 Lane informed Harris:

1. His December 9 disciplinary ticket would be "expunged" from his record because he had not been given 24 hours to prepare his defense, as required by A.R. 804.II.G.2.

2. His good time and "A" grade status would be restored and state pay would be given him for 30 days' time spent in segregation.

Harris was neither returned to Sheridan nor compensated for the loss of his prison industry job.

### Procedural Background

Opinion I addressed the legal sufficiency of Harris' First Amended Complaint. Only three allegations in Harris' Section 1983 claim survived constitutional scrutiny:

1. Defendants' refusal to permit Harris to present his defense—a violation of A.R. 804.II.G.7 and 9—deprived Harris of a fundamental procedural right.

2. Defendants' failure to accord Harris a hearing before subjecting him to an additional five days' segregation[6] contravened the Due Process Clause under *Wolff v. McDonnell,* 418 U.S. 539, 556–58, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974).

3. Defendants' failure to comply with A.R. 819's requirement of a pre-transfer hearing implicated the Due Process Clause.

Although Opinion I found no liberty deprivation flowed from the Committee's refusal to credit Wembley's testimony, it said (532 F.Supp. at 39 n. 5):

This holding would not apply if Harris' claim were that he had not been *apprised* of Wembley's favorable testimony (the Complaint is really not clear on that subject). In that event *Chavis,* 643 F.2d [1281] at 1285–86, holds a due process violation under *Brady v. Maryland* principles.

Finally, constrained by the teachings of *Wilwording v. Swenson,* 404 U.S. 249, 251, 92 S.Ct. 407, 409, 30 L.Ed.2d 418 (1971) and

---

**4.** Defendants have tendered no affidavit to explain the reason for the move. Their May 20, 1982 Mem. at 2 says it was "so that he could be more effectively maintained in segregation status."

**5.** As corroboration defendants have submitted copies of the January 28 and 29 Ten Minute Check on Residents (TMCOR) forms. As the title suggests, correctional officers use the TMCOR to record the completion of each ten minute check on inmates (and also for notations as to individual prisoners). Biroschik Aff. ¶ 3. On January 28 the TMCOR reference to Harris read "C.L. # 3 Harris C–06079." Next day's TMCOR stated "C.L. Harris C 06079—not in ID." "Not in ID" signalled Harris' release from segregation status and the restoration of his general population privileges. Biroschik Aff. ¶¶ 7 and 8. Significantly Harris' original Complaint acknowledges his cell was unlocked on January 29, confirming his restored access to institutional facilities—the most important (and perhaps the only) component of general population privileges. Harris has offered no affidavit contravening the January 29 release from segregation.

**6.** For purposes of defendants' motion to dismiss, this Court was required to accept Harris' allegation of "segregation" while detained in C.L. # 3 for the five day period after his January 29 release date. As is evident from this opinion, that allegation has proved unfounded.

*Johnson v. Avery,* 393 U.S. 483, 484, 89 S.Ct. 747, 748, 21 L.Ed.2d 718 (1969), Opinion I also upheld Harris' habeas corpus count even though that claim challenged the conditions of his confinement rather than his *custody* under state law.

After both sides had filed summary judgment motions as to Harris' Second Amended Complaint, our Court of Appeals in *Shango v. Jurich,* 681 F.2d 1091 (7th Cir. 1982) reversed this Court's decision at 521 F.Supp. 1196 (N.D.Ill.1981)—a decision that had heavily influenced Opinion I's disposition of the pre-transfer issues. That appellate opinion in turn spawned the present Complaint.

■ Count I asserts under Section 1983:

1. Various of the defendants[7] impinged upon Harris' constitutionally protected "liberty" without due process by:

    (a) precluding Harris from presenting his defense at the Committee hearing;

    (b) refusing to divulge to Harris before the Committee hearing the exculpatory testimony of inmate Wembley;

    (c) retaining Harris in segregation for an excessive period (the alleged five days); and

    (d) transferring him to Stateville without the hearing prescribed by A.R. 819.

2. Defendants (except for Lane) violated Harris' due process rights by arbitrarily and capriciously refusing to return him to Sheridan once the basis for his initial transfer was expunged.

3. Lane deprived Harris of equal protection by committing the liberty intrusions just enumerated in paragraph 1,

"intentional[ly], in bad faith and in reckless disregard of plaintiff's constitutionally and administratively secured rights and privileges...."

Count I seeks damages and injunctive relief requiring Harris' retransfer to Sheridan and his reinstatement to his former prison industry job.[8] Predicated on the same asserted due process and equal protection violations, Count II seeks habeas relief tantamount to the injunctive relief sought in Count I.

### Current Motions

This opinion turns at last to the current cross-motions for summary judgment and the motion to dismiss. Though the former were filed during the pendency of the Second Amended Complaint, they (as well as the dismissal motion) will be treated as though directed to the current Complaint.

### Count I

Defendants do not attack the sufficiency of the two aspects of Harris' liberty deprivation claim that charge the Committee's:

1. alleged refusal to allow Harris to present his defense and

2. alleged failure to reveal inmate Wembley's favorable testimony.

Those Section 1983 contentions consequently remain intact.

■ But the other two components of Harris' liberty claim cannot survive. As Harris himself concedes, *Shango* (681 F.2d at 1097–1103) has taught the denial of a pre-transfer hearing—even in violation of A.R. 819—does not implicate Harris' liberty

---

**7.** Count I attributes the due process violations described in text subparagraphs 1(a) and (b) to the Committee and MacDonald and the subparagraph 1(c) and (d) transgressions only to MacDonald.

**8.** Injunctive relief is not necessarily barred by Harris' lack of constitutional entitlement to confinement at a particular prison (see text at n. 10) or to a particular prison job (see Opinion I, 532 F.Supp. at 39 n. 4). Such relief may be awarded to correct harms caused by defendants' assertedly unconstitutional conduct (such

as due process infirmities in Harris' disciplinary proceedings). Nor would injunctive relief be futile on the theory defendants could again exercise their discretion—unfettered by state law—to retransfer Harris or remove him from his prison job. As our Court of Appeals emphasized in *Shango* (681 F.2d at 1098 n. 13), the Constitution bars state prison officials from using their authority "to punish [Harris] for his exercise of his fundamental constitutional rights"—including his right to bring this very lawsuit.

interest.[9] As for the charge of excessive segregation, defendants are entitled to summary judgment. Harris simply did not suffer the deprivations represented by segregation status for more than 30 days. On the uncontroverted affidavits his general population privileges were suspended for only 30 days. This is so because Sheridan has no separate category of segregation cells—all cells have comparable physical dimensions and amenities. Thus "segregation" involves barring access to privileges, and Harris' mere retention in the unlocked C.L. # 3 during the five day period after January 29 cannot be branded as segregation.

■ As for Harris' claim that Lane arbitrarily and capriciously refused to return him to Sheridan, it too must be rejected in light of *Shango*. Because Illinois law does not place substantive limitations on their authority to transfer prisoners, prison officials are free to act as they will (indeed, they need not even purport to apply the discretion their own procedural regulations mandate that they exercise) without implicating the Due Process Clause. 681 F.2d at 1100.[10]

■ Finally Harris has failed to substantiate any equal protection basis for his Section 1983 claim. As already noted, he attempts to convert asserted liberty deprivations into equal protection violations by imputing bad faith and willfulness to defendants. But that conclusory allegation as to defendants' motivations does not establish the gravamen of an equal protection violation: intentional or purposeful *discrimina-*

tion. *Shango*, 681 F.2d at 1104. No discriminatory animus on defendants' part (as the basis for Harris' disparate treatment) has been identified. At most, the charge of bad faith illustrates the arbitrariness of defendants' wrongdoing—but not invidious discrimination. *Id.*

*Count II*

■ Harris' habeas corpus claim must be dismissed because he has not exhausted available state remedies, as required by 28 U.S.C. § 2254(b) and (c). As Judge Will recently recognized in *United States ex rel. Isaac v. Franzen*, 531 F.Supp. 1086, 1091–94 (N.D.Ill.1982), Illinois courts are now willing to issue writs of mandamus to compel state correctional officials to redress infringements of prisoners' constitutional rights.

For example, in *Farnham v. Pinckney*, No. 77–MR–19 (11th Judicial Cir., Livingston Cty., May 15, 1978), an Illinois Circuit Court (1) condemned as a due process violation the Committee's refusal to allow the petitioner to call witnesses at his disciplinary hearing and (2) issued a writ of mandamus rescinding *all of the sanctions* that ensued from the Committee's determination. Moreover, *Tedder v. Fairman*, 93 Ill. App.3d 948, 958, 49 Ill.Dec. 447, 455–456, 418 N.E.2d 91, 98–99 (4th Dist.1981) acknowledged the possibility of compelling inter-institutional transfers (or other remedial action) under mandamus if the inmate's confinement to a particular prison violated the Eighth Amendment's stricture against cruel and unusual punishment.

---

9. This Court is of course bound, though not persuaded, by *Shango*. In any case the due process issue appears a closer one than our Court of Appeals would have it. At least the Court of Appeals for the Ninth Circuit sees the duties of state officials under the Due Process Clause as this Court did. *Wakinekona v. Olim*, 664 F.2d 708, 710–12, 715 (9th Cir.1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 2294, 73 L.Ed.2d 1299 (1982), now awaiting argument. Definitive resolution awaits the Supreme Court decision in *Wakinekona*. Meanwhile our Court of Appeals itself does not always seem to apply the *Shango* pronouncements in their full sweep. *See Walker v. Prisoner Review Board*, 694 F.2d 499 at 503–504 & n. 2 (7th Cir.1982).

10. *Shango* (681 F.2d at 1098 n. 13) does recognize the Constitution forbids an inmate's transfer from one institution to another as punishment for his exercise of fundamental constitutional rights. Harris' most recent filing asks to amend the Complaint to allege that the "denial [of his retransfer to Sheridan] was made . . . for the impermissible purpose of punishing Harris for grieving his discipline and/or filing this lawsuit." Because Harris' counsel should in any case amend the Complaint to conform to this opinion, that allegation should be added at the same time.

There is surely enough here to demonstrate the likelihood Harris could press his constitutional claims in a state mandamus action and, if successful, obtain relief comparable to that afforded in a federal habeas proceeding. Harris is not persuasive in arguing that none of the handful of Illinois mandamus cases involved *both* the same constitutional claims and the same proposed relief as this action. On the contrary, the surprisingly close parallels between *Farnham* and *Tedder* and various aspects (both substantive and remedial) of this case reinforce the opposite conclusion.

### Conclusion

Defendants' motion for summary judgment is granted as to Harris' excessive segregation claim (Complaint Count I ¶ 1–3(a)). Their motion to dismiss is granted as to Count II and all remaining claims in Count I except for the two liberty deprivation claims set forth in Complaint Count I ¶ 1–2. Harris' motion for summary judgment is denied.